(No. 56349.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. GREGORY JOHNSON, Appellant.

*Opinion filed April 2, 1987.*

James J. Doherty, Public Defender, of Chicago (Richard E. Cunningham and Ira Churgin, Assistant Public Defenders, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago

14

(Mark L. Rotert, Assistant Attorney General, of Chicago, and Joan S. Cherry, Thomas V. Gainer, Jr., and Donald G. Schweihs, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Gregory Johnson, was convicted of murder, conspiracy, and attempted armed robbery. The defendant waived the right to a jury for purposes of a death penalty hearing, and the trial judge sentenced the defendant to death for his murder conviction. The death sentence was stayed pending direct review by this court. Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d Rules 603, 609(a).

The defendant's convictions resulted from a robbery attempt at an apartment building in Chicago on December 3, 1980. Around 4:30 that afternoon, Christine Bruce answered a knock at the front door of her apartment and found two men, strangers, standing outside in the hallway. As Bruce tried to determine the purpose for their visit, she noticed what appeared to be a piece of pipe in the hand of the first man. Realizing that the pipe was actually a gun, Bruce screamed and jumped away. Bruce's husband, William Hallars, who was sitting on a couch next to the front door, saw that the man was holding a shotgun; the gun went off before Hallars could slam the door shut. Bruce and Hallars ran to the kitchen to call the police. There, Hallars saw that someone was opening the back door, and as he shut and locked the door he saw two shadows go by. Bruce's 10-year-old daughter, Laura, was sitting on the other side of the living room when the men appeared at the front door, and she was struck and killed by the shotgun blast; Bruce,

Hallars, and their nine-year-old daughter, Serena, who was also present, were not harmed.

Bruce was able to give the police a description of the first person at the door, the one holding the shotgun, but she could recall only a few details about the second. Hallars had observed only the clothing of the first person and was unable to provide a fuller description. That night, Bruce viewed photographs of possible suspects but did not make any identifications. Several days later, Bruce assisted a police artist in producing a sketch of the gunman. On December 9, Bruce selected the defendant from a photographic array, and a week later, on December 16, she identified the defendant in a lineup.

Bruce and Hallars testified at the defendant's trial, in September 1981, and Bruce made an in-court identification of the defendant as the gunman. Bruce was the manager of the apartment building where she and her family lived, and in that capacity she would collect the other tenants' monthly rent payments, which often were made in cash. Leroy Carter, an accomplice witness who testified in the State's behalf, explained that the offenses charged here grew out of a plan to rob the building manager of the rent receipts. According to Carter, the robbery scheme had been proposed by Joseph Clay, who lived in an apartment above the one occupied by Bruce and her family.

As Carter described it, he, Clay, and the defendant met at least two times in late November and early December 1980 to plan the robbery; a fourth person, Wesley Heard, was also present on one occasion. Clay told the others that he would notify them when the rents had been collected. Carter testified that the defendant came to his home on December 3 and said that Clay had suggested committing the robbery that day. Carter and the defendant then went to Wesley Heard's residence, where they obtained a sawed-off shotgun; the defendant hid the

weapon under the hood of Carter's car. Carter, the defendant, and Heard arrived at Clay's building around noon, and Clay met them there several hours later. According to Carter, Clay instructed him to act as a lookout in the front of the building and to accompany the defendant to the manager's apartment. After the defendant and Carter gained admittance to the apartment and tied up the residents, Clay was going to enter and find the rent money. Heard was to act as a lookout in the alley behind the building, near the back door of the manager's apartment. Following the robbery, Clay, as a tenant of the building, was to provide investigating officers with false descriptions of the robbers.

Carter testified that he then went to the lobby of the building and was soon joined there by the defendant, who was armed with the shotgun. They proceeded to the manager's apartment; the defendant knocked at the door, and Carter heard a scream and heard the gun go off. Carter and the defendant then fled from the building. Carter said that he did not see Christine Bruce in the doorway and that he was about 5 feet from the defendant when the apartment door opened.

Carter was arrested on December 8, 1980, and charged in connection with these offenses. He testified that in exchange for his testimony the State had agreed to drop the murder charge; he was to plead guilty to attempted armed robbery, for which the State would recommend a 10-year sentence. Carter also acknowledged his criminal record, which included convictions for armed robbery, burglary, and unlawful use of weapons.

Defense counsel attacked the evidence of the defendant's guilt on several fronts. Sherona Heard, who was the defendant's girlfriend, and Delores Myers testified that they were with the defendant at Wesley Heard's apartment on December 3, 1980. According to the two women, Carter, Wesley Heard, and a third person left

the apartment sometime around noon that day with a shotgun; the defendant did not go with them. On cross-examination, Sherona Heard provided an alibi for the defendant for the remainder of that day.

Defense counsel also attacked Carter's credibility and questioned his description of the events leading up to the robbery attempt. A police officer testified that the defendant was in court on the morning of December 1, which was the same time when Carter, the defendant, and Clay were meeting to plan the robbery, according to statements that Carter made before trial. A jail guard testified that he witnessed a statement by Carter to defense counsel in which Carter said that he was with the defendant at the front door of the building manager's apartment and that he saw Christine Bruce in the doorway.

Finally, defense counsel questioned Christine Bruce's description of the gunman and her opportunity to observe the two persons who appeared at her door on December 3. A former resident of the apartment building testified that the light over the entrance to the manager's apartment was controlled by the same device used to activate lights outside the building. The witness, who had been a janitor in the building, said that in the summer of 1981 the timer was set to go on at 7:30 p.m. Also, the police sketch of the gunman depicted a person with a full beard, though Bruce testified that she had described a person with only a goatee. Finally, defense counsel elicited from Bruce the information that she has been blind in one eye since birth.

In rebuttal, the State presented the testimony of Bruce's optometrist. He said that he had examined Bruce in February 1980 and that the vision in her seeing eye was 20/30, with myopic astigmatism. He believed that Bruce would have been able to observe a person standing 5 to 10 feet away. The optometrist also said

that he had prescribed glasses for Bruce but that she did not need to wear them all the time.

The defendant was convicted of murder, attempted armed robbery, and conspiracy. The State requested a death penalty hearing for the murder conviction, and the defendant chose to be sentenced by the trial judge. The defendant's eligibility for the death penalty was based on the occurrence of the murder in the course of his committing a felony, armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6)(c); see *People v. Ramirez* (1983), 98 Ill. 2d 439, 458; *People v. Walker* (1982), 91 Ill. 2d 502, 512), and it was shown that the defendant was 26 years old at the time of the offense. In aggravation, the State presented evidence of the defendant's criminal history, which included two previous convictions for armed robbery as well as several adjudications of delinquency. In mitigation, defense counsel introduced written statements by Clay and Heard to the effect that Carter was the gunman; no other mitigating evidence was presented. The trial judge sentenced the defendant to death.

In advance of trial the defendant moved to sever his trial from that of Carter, Clay, and Heard. The State did not oppose the motion, and it was granted. One of the grounds for the motion was *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, and indeed the severance order served to protect the defendant from any "spillover" prejudice that would occur in a joint trial in which the statements of his alleged accomplices were introduced into evidence against them. The defendant believes that in spite of the severance order a worse error occurred. He argues that the State was improperly allowed to introduce into evidence inadmissible hearsay statements by Clay and Heard identifying him as the gunman; when called by the defense, Clay and Heard asserted the privilege against self-incrimina-

tion, and therefore they were unavailable to testify at trial. The defendant contends that the State invited the jury to use the information as substantive evidence of guilt, in violation of his Federal and State constitutional rights to confront witnesses against him. (See U.S. Const., amends. VI, XIV; *Pointer v. Texas* (1965), 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065; Ill. Const. 1970, art. I, sec. 8; see also *People v. Tennant* (1976), 65 Ill. 2d 401, 408 (the Federal and State confrontation clauses "are meant to protect the same interest").) The out-of-court accusations by Clay and Heard implicating the defendant were revealed in the testimony of two police officers, Grogman and Stachula, and the prosecutor relied on the information in closing argument to the jury.

Christine Bruce testified that she had told the police that the person with the gun was 5 feet 10 inches to 6 feet in height; an investigating officer, William Calabrese, testified that Bruce gave that description to him on the day of the murder. The police also received a different description of the gunman, however, indicating a shorter person—one who stood 5 feet 4 inches to 5 feet 7 inches—and it was the latter description that appeared in the police department's daily bulletin for December 7, 1980, accompanied by the police artist's sketch of the gunman. The description containing the shorter height also appeared in a report made by Detective Chris Grogman. Grogman had spoken to Bruce on the night of the murder, and on cross-examination defense counsel asked the detective whether Bruce had described a person who was 5 feet 4 inches tall. Grogman replied that she had not. On redirect examination the following occurred:

"[MR. TELANDER]: Who gave you the description of five, four?

A. The tenant in the upstairs apartment, Mr. Joseph Clay.

"Q. That is the same Joseph Clay who was later arrested?

A. Yes.

Q. Based upon naming Johnson, you went out and showed Gregory Johnson's photograph to the victim?

A. Yes, sir.

Q. They were arrested before Carter?

A. That is correct."

On further cross-examination, Grogman explained again that Bruce had not provided the 5 feet 4 inches description, though he acknowledged that it was that description that had appeared in the police department's December 7 "hot sheet" along with the sketch of the gunman. On further redirect examination Grogman was permitted to explain, over repeated objection, the following:

"Q. When you interviewed Joe Clay and got the description, you didn't know if he was a suspect at that time?

A. No, sir.

Q. He later became the co-defendant of this guy over here?

MR. McDONNELL: Objection. Improper recross.

THE COURT: You opened the door so wide open. Proceed.

MR. McDONNELL: Your Honor, at one time—

THE COURT: I have ruled. Proceed.

MR. TELANDER: Q. And he is now the co-defendant of this man here?

THE WITNESS: A. Yes.

MR. DONOVAN: Objection. He is not the co-defendant.

THE COURT: Overruled.

MR. TELANDER: Q. He is also the same Joe Clay who led you to Gregory Johnson?

THE WITNESS: A. Yes, sir.

Q. As did Mr. Heard?

MR. McDONNELL: Objection.

THE WITNESS: Yes, sir.

MR. McDONNELL: Improper redirect.

THE COURT: Counsel. I ruled.

MR. TELANDER: Q. All before Mr. Carter's name was even known?

THE WITNESS: A. Yes, sir.

Q: When Heard and Clay were arrested—

MR. McDONNELL: I only asked one question[,] Counsel.

THE COURT: Overruled.

MR. TELANDER: Q. When Heard and Clay were arrested, Carter wasn't known and they immediately named Gregory Johnson as the shooter?

MR. McDONNELL: Objection.

THE COURT: Overruled.

MR. TELANDER: Q. Gregory Johnson was named as the shooter?

THE WITNESS: A. Yes."

At the conclusion of Detective Grogman's testimony, defense counsel moved for a mistrial. The trial judge denied the motion, saying that counsel's question whether Bruce had described the shorter person "opened it up to anything they wanted to give where five, four came from."

The defendant also argues that similarly inadmissible hearsay was elicited from Detective Joseph Stachula in an effort to rehabilitate the witness. On direct examination Stachula explained the steps culminating in the defendant's arrest and Bruce's identification of him in a lineup, and on cross-examination defense counsel questioned the thoroughness of the investigation. Noting Carter's statement that the shotgun had been hidden under the hood of his car, counsel asked whether the car had been examined for fingerprints; Stachula said that he was not sure whether that had been done. Stachula also conceded that he had not tried to confirm Carter's statement that on the morning of December 3 he had gone to his child's school. Finally, Stachula said that the

case was still open and that a fifth, unknown suspect was being sought.

On redirect examination of Detective Stachula, the State elicited information regarding different ways in which Carter's statement had been corroborated:

"A. They asked you about corroboration and whether you had anything to corroborate Carter. Did you ever get a chance to look at Clay's and Heard's written statement[s]?

MR. McDONNELL: Objection, Judge I had a prior conversation and I ask to be heard outside the presence of the jury.

THE COURT: Motion is denied.

MR. TELANDER: Would you look at Clay's and Heard's statement[s]?

A. Yes, I did.

Q. Did the fact that Joe Clay said Gregory Johnson had the shotgun corroborate Mr. Carter—

MR. McDONNELL: Objection, your Honor.

THE COURT: Overruled, counsel.

MR. McDONNELL: I ask to be heard on this.

THE COURT: Counsel, your partner really opened this up, proceed, counsel.

MR. TELANDER: The fact—I don't know if you answered the fact that Joe Clay said that he has got the shotgun corroborates Carter?

A. Yes, it did.

Q. Did the fact that [Wesley] Heard said he—Gregory Johnson got the shotgun corroborate Carter?

A. Yes, it did.

*  *  *

Q. Does the fact [Wesley] Heard says it is Carter, Clay, himself and Johnson corroborate Carter's statement?

A. Yes, sir.

Q. Does the fact that Clay immediately says—

MR. McDONNELL: I will continue an objection, your Honor.

THE COURT: It is overruled.

MR. TELANDER: Does the fact Joe Clay says it, Johnson, Carter and Heard corroborate Carter's statement?

MR. McDONNELL: Objection, calls for a conclusion.

THE COURT: Overruled.

THE WITNESS: A. Yes, sir, it does.

MR. McDONNELL: This is his opinion, Judge.

THE COURT: Overruled, counsel, on the basis of the cross-examination of your partner, proceed.

MR. TELANDER: Let me show you people's thirty-five which is Joe Clay's statement which is this one here.

THE COURT: Let him read individual.

MR. TELANDER: Does the fact Joe Clay says that Gregory carried the shotgun out with him corroborate what—

MR. McDONNELL: Object to the form of the question.

THE COURT: He already answered, the answer is yes.

MR. TELANDER: Q. Did you read both statements?

A. Yes, I did.

Q. The whole complete both statements corroborating everything that Carter said?

MR. McDONNELL: Objection, improper question.

THE COURT: Overruled, counsel, on the basis of the cross-examination of your partner. He may answer it, yes or no.

THE WITNESS: A. Yes, both those statement[s] corroborate Leroy Carter's statement."

Detective Stachula went on to say that Heard was arrested first, Clay second, and Carter third, and that Heard and Clay gave their statements before Carter gave his. Further corroboration of Carter's statement had been found in that of another nontestifying witness, Delores Whitaker, who was present in Clay's apartment before the robbery attempt.

When Detective Stachula was finished testifying, defense counsel moved for a mistrial. The trial judge denied the motion because he believed that counsel's ques-

tions testing the thoroughness of the investigation had opened the door for the evidence.

The State raises several points in support of the admission of the evidence of Clay's and Heard's statements implicating the defendant. First, the State believes that Grogman's testimony regarding the 5 feet 4 inches height description may be justified under the co-conspirator exception to the hearsay rule: Clay gave the misleading description before his arrest and during what has been termed the concealment phase of the conspiracy. (See *People v. Goodman* (1980), 81 Ill. 2d 278; *People v. Meagher* (1979), 70 Ill. App. 3d 597.) Grogman's testimony regarding Clay's statement was not so limited, however. The detective went on to explain that Clay, after his arrest, implicated the defendant in the scheme and said that the defendant was the gunman.

The State also argues that the evidence regarding Clay's and Heard's statements to the police was properly admitted to explain to the jury the procedures followed by the police in this case. Although a police officer's testimony recounting steps taken in the course of an investigation may be admissible without violating a defendant's confrontation rights, even though the officer's description of the progress of the case might suggest that nontestifying witnesses implicated the defendant (see *People v. Holman* (1984), 103 Ill. 2d 133, 149; *People v. Dixon* (1982), 105 Ill. App. 3d 340, 347; see also *People v. Johnson* (1986), 114 Ill. 2d 170, 194), the testimony presented here went beyond that. The detectives did more than simply recount what had been done; their testimony regarding the statements of Clay and Heard directly implicated the defendant in these crimes.

The State makes the related argument that the evidence of Clay's and Heard's statements identifying the defendant as the gunman was warranted as an explanation of certain matters raised by defense counsel in

cross-examination of Detectives Grogman and Stachula. In *People v. Payne* (1983), 98 Ill. 2d 45, the defendant was arrested with a codefendant in the latter's apartment on a charge of armed robbery, and a search of the premises revealed two guns, one of which had been used in committing the offense. At trial, defense counsel elicited from an investigating officer the testimony that the defendant, the codefendant, and the apartment were searched at the time of the arrest. The evidence revealed in the search of the apartment had been suppressed, however, and defense counsel therefore was prepared to argue that nothing incriminating had been discovered. The trial judge allowed the State to introduce into evidence the weapon used in the robbery to defeat the misimpression that defense counsel was planning to exploit. This court affirmed, explaining:

> "While we agree that defendants could argue the lack of corroboration of the identifications or point out that the State's case depended almost entirely upon the reliability of the identification testimony, we do not believe that they could affirmatively misrepresent or falsely imply that the police found no physical evidence connected with the robbery during their search. [Citations.]" *People v. Payne* (1983), 98 Ill. 2d 45, 50-51.

It is less clear in this case, however, that the evidence of Clay's and Heard's out-of-court accusations was necessary to correct a misrepresentation or false implication. In cross-examination of Detective Grogman, defense counsel inquired whether Christine Bruce had described the gunman as 5 feet 4 inches in height. Once it was shown that Clay had given that description, it was not necessary to have the witness say that Clay later implicated the defendant. Similarly, although defense counsel's cross-examination of Detective Stachula invited the State to rehabilitate the witness by having him explain areas in which the police were confident of Carter's

statement, the prosecutor's lengthy review of Clay's and Heard's statements went beyond that, to directly affirm that Clay and Heard had identified the defendant as the gunman. The prosecutor did that even though Detective Stachula, in response to a question on cross-examination, had explained in general terms that the police had statements from witnesses other than Carter before presenting the case to the grand jury.

The State believes that the evidence of Clay's and Heard's out-of-court accusations against the defendant was not meant to play a substantive role here. If that were true, then arguably no confrontation problem would be present. (See *Tennessee v. Street* (1985), 471 U.S. 409, 85 L. Ed. 2d 425, 105 S. Ct. 2078.) But even if the evidence had nonhearsay uses and was therefore proper, the State abandoned those uses in closing argument. There, the prosecutor invited the jury to consider the out-of-court statements implicating the defendant as substantive evidence of his guilt. The prosecutor told the jurors:

> "Now Christine's testimony alone is more than enough to convince you that he [*i.e.*, the defendant] is guilty of murder but you have much more in this case. You have Leroy Carter. Now Ernie told you from the back that you don't like Leroy Carter, we don't like him and he is going to the penitentiary and that is where he belongs. He is a punk like these guys. He is a buddy and just like them. But Leroy Carter from the very beginning tells what happened and then Leroy says right away that is the killer. Now that is all you have. Either because you know from the evidence that Jo[e] Clay and Wesley Heard are arrested first and you know from the evidence when Heard is arrested what does he say right away? Gregory Johnson is the killer.
>
> MR. McDONNELL: Objection.
> THE COURT: Denied, you brought it out, counsel.
> MR. McDONNELL: Absolutely not.

MR. TELANDER: Wesley Heard tells the police the man with the sawed off shotgun is Gregory Johnson. When he tells the police that the police don't even know who Carter is so what do the police then do? They get Clay. What does Clay say? Gregory Johnson. Gregory Johnson is the man with the gun and the police don't even know at that time who Carter is. \*\*\* Carter comes in the exact same thing. Four people have told you that. The testimony is the [*sic*] Gregory Johnson is the man who killed Laura Bruce.

MR. McDONNELL: Objection.

THE COURT: Overruled."

And in rebuttal argument, the prosecutor said:

"More importantly than that most important in this case you know, ladies and gentlemen, that what Carter said was said by Heard and Clay before Carter was ever arrested by the police—

MR. McDONNELL: Objection, we haven't heard a word from Heard.

THE COURT: The jury has heard the evidence.

MR. DiBENEDETTO: You heard a few words from Heard and Clay. I can't bring them out in here in front of you because—

MR. McDONNELL: Objection.

THE COURT: The jury heard the evidence.

MR. McDONNELL: He can bring anyone not in the courtroom as witnesses[,] Judge.

THE COURT: Objection sustained. Let[']s go on."

Neither Clay nor Heard testified, and we question the grounds on which the State would justify the use at trial of Clay's and Heard's out-of-court statements implicating the defendant. Moreover, any nonhearsay use of the evidence was belied by the prosecutor's closing argument, in which he assured the jurors that Clay and Heard had also implicated the defendant in the robbery scheme and had identified him as the gunman. Apart from Clay's prearrest description of the gunman as 5 feet 4 inches in height, which was arguably within the co-conspirator ex-

ception, the State does not contend that any of the remaining out-of-court statements of Clay and Heard fit within an exception to the hearsay rule or that they otherwise contained sufficient indicia of reliability to warrant their use. (*Cf. New Mexico v. Earnest* (1986), 477 U.S. 648, 649, 91 L. Ed. 2d 539, 540, 106 S. Ct. 2734, 2735, (Rehnquist, J., concurring).) We conclude that the substantive use of the evidence violated the defendant's confrontation rights under the Federal and State constitutions. See *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056; *Douglas v. Alabama* (1965), 380 U.S. 415, 13 L. Ed. 2d 934, 85 S. Ct. 1074; see also *People v. Tennant* (1976), 65 Ill. 2d 401.

Confrontation errors, though constitutional violations, do not automatically warrant reversal (see *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056; *Delaware v. Van Arsdall* (1986), 475 U.S. 673, 89 L. Ed. 2d 674, 106 S. Ct. 1431; *Schneble v. Florida* (1972), 405 U.S. 427, 31 L. Ed. 2d 340, 92 S. Ct. 1056), and the defendant's convictions may therefore be affirmed if we are able to conclude that the error was harmless beyond a reasonable doubt (see *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824). The error in admitting the evidence was repeated rather than isolated. The prosecutors referred at length to Clay's and Heard's statements implicating the defendant, through the examination of the two detectives, and they stressed the information in closing argument, when they sought to buttress Carter's and Bruce's testimony by emphasizing the number of other persons who allegedly had implicated the defendant. Moreover, the defendant did not confess to the crime, and there was no physical evidence connecting him to the occurrence. Although both Christine Bruce and Carter, the accomplice witness, testified that it was the defendant who fired the shotgun, their testimony was controverted in several respects. Clay's

and Heard's out-of-court accusations against the defendant went to the central issue at trial—whether the defendant was the gunman—and we cannot say that the error in presenting that information as substantive, and therefore hearsay, evidence of the defendant's guilt was harmless beyond a reasonable doubt. (See *People v. Smith* (1967), 38 Ill. 2d 13; *People v. Campbell* (1983), 115 Ill. App. 3d 631.) We do not believe, though, that retrial, or resentencing, is barred by evidentiary insufficiency. See *People v. Taylor* (1979), 76 Ill. 2d 289, 309.

Because of the result here, we need not consider the defendant's remaining contentions in this appeal. For the reasons stated, the defendant's convictions are reversed, the sentence of death is vacated, and the cause is remanded for a new trial.

*Reversed and remanded.*