THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. OMAR DIXON, Defendant-Appellant.

First District (5th Division)   No. 85—3573

Opinion filed May 6, 1988.—Rehearing denied June 8, 1988.

Steven Clark and Michael J. Pelletier, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Kenneth T. McCurry, Lynda A. Peters, and Rena M. David, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

Following a joint jury trial, defendant, Omar Dixon, and William Moore were found guilty of murder and attempted armed robbery. Defendant was sentenced to concurrent terms of 30 years for murder and 10 years for attempted armed robbery. Moore received sentences of 40 years and 10 years, respectively. On appeal, defendant contends (1) that his sixth amendment rights were violated by (a) the admission of the extrajudicial statement of his nontestifying codefendant implicating him in the offenses and (b) the State's closing argument wherein the prosecutor improperly told the jury to consider that statement against him and (2) that his sentences were excessive.

The charges arose out of the death by shooting of 17-year-old Benjamin Wilson on November 20, 1984. Prior to trial, defendant filed a motion for severance, asserting that his and Moore's defenses were antagonistic and that the admission of Moore's statement at trial would violate his sixth amendment right of confrontation under the rule in *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, if Moore exercised his right not to testify at trial. The motion was denied on the ground that even assuming Moore did not take the stand, under the holding in *Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132, severance was not required because defendant's own statement interlocked with Moore's in most material respects and, if necessary, could be redacted to avoid a *Bruton* problem.

At trial, 17-year-old Jetun Rush testified that at about 12:30 p.m. she and Wilson, who was her boyfriend and the father of her child, left Simeon Vocational High School (Simeon) where they were students and

began walking north on Vincennes Avenue. They noticed a group of boys and girls standing on the grass and the sidewalk in front of a store about one-half block from the school. By the time they reached the group, the girls had walked away, leaving about five or six boys gathered on and next to the sidewalk. Attempting to make their way around the group, Wilson, who was to the side of and behind her, said, "[E]xcuse me." One of the boys—identified by her to be Moore—who had been standing to their right near the fence turned around and asked Wilson what he had said. Wilson repeated, "[E]xcuse me," and continued walking another four or five feet. At that point, a taller boy—identified as Dixon—who had been standing on the grass to their left stepped in front of Wilson, grabbed him by his jacket and said, "Say, man, you got any money?" Wilson pushed him away, responding, "Hey man, you think you're tough?" Dixon repeated his demand for money and reached into his pockets. Wilson pushed him away again, asking, "What are you going to do, shoot me?" Defendant responded, "You still think you're tough," and then said to Moore, "[L]et's shoot this punk," whereupon she heard the first shot fired by Moore. As Wilson tried to dodge away she saw Moore shoot him a second time, after which he fell into her arms. Defendant then exhorted Moore, "Let's go man. Here come the police." and they both ran from the scene. After seating Wilson down next to the fence, she ran back to the school from where the police and an ambulance were summoned. Later that evening, she viewed two lineups and identified both Moore and defendant as the offenders.

On cross-examination, Rush repeatedly denied that Wilson had argued with Moore; however, she acknowledged telling the responding officers that Wilson bumped into one of the boys and that there had been a verbal altercation. She further stated that, having seen the gun in Moore's waistband when he first turned around, she warned Wilson of it and admonished him, "[L]et's go," but she did not attempt to physically pull him away; and that each time she was asked to describe what had occurred, she told the police that defendant had said to Moore, "[L]et's shoot this punk."

Detective Bosco testified that when he questioned defendant following his arrest later that evening defendant told him that he was standing in front of the store with his friend Leonard Whitlock when Wilson, who had been walking with his girlfriend, bumped into Moore. An argument ensued and it appeared that Wilson intended to fight. At that point, Moore produced a handgun and shot Wilson twice. As he (defendant) and Whitlock walked away, he observed Moore running from the scene. On cross-examination, Bosco stated that when he in-

terviewed Rush a few hours after the shooting, she told him that there had been an argument but she did not say that she saw a gun prior to the time Moore fired it at Wilson. Neither did she tell him that defendant told Moore to shoot Wilson, but it was his (Bosco's) belief that she related that information to another officer, Detective McGuire, who did not testify at trial.

Sean Baylis, a student at Simeon, testified that he was walking toward the store when he saw defendant and Whitlock, both of whom he knew from the neighborhood, and two other boys standing near the school gate. After exchanging greetings, he proceeded to the store to play some video games. A short time later, defendant and the three other boys came into the store for a few minutes and then left. While his companion took his turn on the video game, he sat down near the front window of the store from where he saw defendant approach Wilson, grab his arm, say something to him and then push Wilson back toward the store window. Moore then pulled out a gun and shot Wilson. Wilson walked behind a tree in front of the store but when he came from around it, Moore shot him a second time.

On cross-examination, Baylis stated that it was when he heard a bump against the store window that his attention was drawn to the scene in front of the store. After the shooting, a tall boy came to Wilson's aid. He immediately returned to school without saying anything to anyone, but later, after another student informed the police that he (Baylis) had witnessed the shooting, he was summoned to the principal's office, where he told the assistant principal and two police officers what he had witnessed. Later that evening, he repeated the same information three different times to plainclothes officers at the police station.

John Everett, the assistant principal of Simeon, testified that when he was informed that Wilson had been shot, he went to the scene, where he saw several students surrounding Wilson, attempting to comfort him. He spoke with Baylis, who was among the students on the scene, but because Baylis appeared to be somewhat stunned, he took him back to his office at the school. There, Baylis told him, in the presence of the school's youth officer and another Chicago police officer, that two boys, one of whom he knew as "Omar," had confronted Wilson outside the store. Baylis did not mention that any pushing had occurred or that Wilson had run behind a tree after the first shot.

John Brady, an assistant State's Attorney assigned to felony review on the night of the shooting, testified that he first questioned Moore at 2 a.m. and, at about 3:15 a.m., presented him with a written summary of the statement he made during the 2 a.m. interview.

According to the summary, which Brady read from the witness stand, Moore stated that on the morning of the shooting, he met Whitlock, his cousin—Eddie Thompson—and defendant at Calumet High School, where they were students. They discussed an incident in which $10 had been taken from Thompson's sister, Cynthia, at Simeon the previous day. Moore told Whitlock that he was going to Thompson's house to get a gun and would meet him (Whitlock) back at school afterward. Later, the four of them took a bus to Simeon and walked to a video game room where they met some girls they knew. From there, he, Whitlock and defendant walked to a second game room on Vincennes Avenue. As he was standing on the sidewalk talking to a girl named Kim, he was bumped in the back. He turned around and upon seeing Wilson, whom he had seen play basketball at Simeon the previous year, he asked, "[W]hat's going on, tall boy?" to which Wilson replied, "[F]--- you." He responded in kind and in the course of the argument that ensued, he drew the .22 caliber pistol he had taken from Thompson's house. At that point, defendant said, "[L]et's see if this punk has some money," and attempted to reach into Wilson's pockets. Wilson asked, "What are you going to do, shoot me?" Defendant then pushed Wilson and when Wilson pushed him back, defendant yelled "pop him," whereupon he (Moore) fired two shots at Wilson. He, Whitlock and defendant then ran from the scene. He gave the gun to defendant, who later told him that Thompson had taken and hidden it. When he later saw Thompson and asked about the gun, Thompson told him that he had "put it up somewhere." The only portion of Brady's summary not read to the jury was that Moore stated that after being pushed by Wilson, "[defendant] yelled, pop him!" that excerpt having been ordered redacted by the trial court.

Brady further testified that he also prepared a handwritten summary of the statement made by defendant during a conversation with him at 11 p.m. which he gave to defendant at about 3:25 a.m., a few minutes after his second meeting with Moore. According to Brady's summary, which he also read during his direct examination, defendant's account of the events of the morning of November 20 was virtually identical to Moore's. Regarding the incident involving the $10 taken from Thompson's sister the day before, defendant added that when they saw Kim and Erica at the video game room, the girls told them that the person who had taken the money from Cynthia was an older boy who was not a student at Simeon. He, Moore and Whitlock then walked to the store on Vincennes Avenue. As they were standing on the sidewalk talking, a tall boy [Wilson] bumped into Moore. Wilson and Moore began to argue and Moore pulled out a gun. Wilson asked,

"Are you going to shoot me?" Defendant then said, "[L]et's see if this punk has some money," and walked toward Wilson whereupon Wilson pushed him. When he said to Moore, "[T]his punk pushed me," Moore pulled out a gun and shot Wilson twice, following which they ran from the scene. Later, they drove to Moore's house and waited in the car while Thompson hid the gun somewhere in the backyard. Brady testified that each summary was read and signed by Moore and defendant, respectively.

On cross-examination, Brady reiterated that the summaries were not verbatim accounts of defendant's and Moore's statements but stated that they both had refused to give a sworn, court-reported statement. He also acknowledged, on cross-examination by counsel for Moore, that in his summary of his conversation with Moore, he excluded, as being irrelevant, Moore's statement that the person who took the $10 from Thompson's sister had put the money down the front of his pants and told her that she would have to take the money out of his pants if she wanted it back and that it was because of that incident that Moore decided to take the gun from Thompson's house.

Kimberly Smith testified that defendant, Moore, Whitlock, Thompson and Marcellus Hunter, all of whom she knew from her neighborhood, were walking past the store as she and a classmate approached it during their lunch period. They stopped in front of the store, and while she was talking to Hunter, she saw a boy and a girl (Wilson and Rush) walk through the group. As they did, she noticed that Moore "fell back," after which Moore and Wilson began to argue. Rush unsuccessfully tried twice to pull Wilson away. During the argument, Moore and Wilson stepped closer to each other but then Moore took two steps backward. It was at that point that she heard loud noises. She saw Wilson bending over and then ran back to school.

On cross-examination by the State, she acknowledged that after the shooting she did not tell anyone what she had seen. On cross-examination by defendant, she stated that she had asked Whitlock to "cool out the argument" because she was afraid that something was going to happen, and that just after that, she heard the loud noise. At no time did she see defendant or Wilson push the other nor did she hear defendant say anything to Moore or put his hands into Wilson's pockets. Neither did she hear Wilson say "What are you going to do, shoot me?" or see anyone holding a gun.

Defendant testified that on the morning of the shooting, he and Moore met near their lockers at Calumet High School and agreed to skip their classes and go to Thompson's house, where they ate breakfast and spent the morning watching television. While there, Moore

and Thompson told him about the incident involving the taking of money from Thompson's sister, Cynthia, but there was no discussion of seeking revenge or of confronting a person known as "Iceberg." Just before leaving Thompson's house, sometime after 11 a.m., Moore came down the stairs and showed him a small gun. Moore then went back upstairs with the gun and a short time later he came down with his coat and they left. He, Moore and Thompson returned to their school, where they met Whitlock, and then took a bus to Simeon to see some friends. They went to a video game room on 81st Street and Normal Avenue, played a few video games and, after about 10 minutes, he and Moore walked Erica back to school. From there, they walked to a store on Vincennes Avenue where they were rejoined by Whitlock, Erica, Kimberly Smith and Marcellus Hunter. As he was standing in the grass talking to Whitlock, a tall boy and a girl (Wilson and Rush), neither of whom he knew, walked up to the group and he then saw Moore "bounce off the fence" as though he had been bumped into it. He then heard Moore ask Wilson for an apology. Wilson said, "I don't owe you no type of apology. F--- you," to which Moore responded in kind. The girl attempted to pull Wilson away but he pulled away from her and continued arguing with Moore. It appeared to him that Wilson and Moore might begin to fight and he would have helped Moore if a fight had occurred, but because there was no physical contact between them he did not intervene. He did not grab, push or touch Wilson in any way nor did he say anything to Wilson or to Moore prior to the shooting. Rather, he testified, it was Wilson who began walking toward Moore, at which point he heard two gunshots. He did not see the gun nor did he know that Moore had been carrying it. He immediately ran from the scene and boarded a bus on 79th and Vincennes. Moore and Whitlock boarded the same bus at the next stop. ·

When he arrived home shortly after 9 p.m. that evening, the police grabbed him, handcuffed him and, after stops at Moore's and Whitlock's homes, they took him to the police station. Later that evening, he stood in a lineup and was then placed in a room alone. About one-half hour later, Brady and a police officer came in to question him. He told Brady that Moore "was in an incident with this guy and that he [Moore] had shot him." After appearing in several more lineups, he was taken back to the room where he remained alone for several hours until Brady returned and told him that his previous statement was a lie and that there was "more to it." When he told Brady that what he had related was true, Brady left. A few minutes later, he was taken to another room where he remained most of the night. At about 3:30 a.m. Brady, accompanied by two police officers, came in with a prepared

written statement and told him to read and sign it. Although the statement was not true, he signed it because he had not slept, eaten or talked to anyone while at the police station and was very tired and afraid and "just wanted to get it over with." No one asked him if he wanted to make a court-reported statement nor was he told that he was under arrest for any crime. He believed that he had been brought in only for questioning and it was not until about 6 a.m. that Brady informed him that he was under arrest for murder.

On cross-examination by the State, defendant denied that he left school that morning to get a gun. He also specifically denied the truth of the statements attributed to him in Brady's summary regarding his involvement and participation in the events immediately preceding and following the shooting.

Moore's uncle was the only witness called on his behalf, testifying to Moore's background and character. Moore expressly waived his right to testify.

Following argument by counsel, the jury found defendant and Moore guilty of murder and attempted armed robbery. Post-trial motions were denied, sentences were imposed, and this appeal followed.

OPINION

Defendant contends that the trial court's denial of his motion for severance resulted in the violation of his sixth amendment right of confrontation by reason of the admission of Moore's statement implicating him in the crimes and the prosecutor's improper invitation to the jury to consider it as substantive evidence of his guilt.

■■ ■ The confrontation clause of the sixth amendment guarantees the right of a criminal defendant to be confronted with the witnesses against him, essential to which is the right to test the truth of their assertions through cross-examination at trial (*Pointer v. Texas* (1965), 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065). For purposes of the confrontation clause a "witness against a defendant" is one whose testimony is part of the body of evidence which the jury may consider in determining his guilt or innocence. (*Cruz v. New York* (1987), 481 U.S. 186, 95 L. Ed. 2d 162, 107 S. Ct. 1714; *Richardson v. Marsh* (1987), 481 U.S. 200, 95 L. Ed. 2d 176, 107 S. Ct. 1702.) When two defendants are tried jointly, the pretrial statement of a codefendant implicating the other defendant is admissible against that defendant as long as the codefendant takes the stand, waives his fifth amendment rights and is subject to full and effective cross-examination (*Nelson v. O'Neil* (1971), 402 U.S. 622, 29 L. Ed. 2d 222, 91 S. Ct. 1723). Similarly, a nonparty witness whose testimony against a code-

fendant is admitted with the limiting instruction that it may not be used against the defendant ordinarily is not considered a "witness against" him because it is a generally accepted principle that jurors are presumed to follow the instructions given to them (*Richardson v. Marsh* (1987), 481 U.S. 200, 95 L. Ed. 2d 176, 107 S. Ct. 1702; *Francis v. Franklin* (1985), 471 U.S. 307, 324 n.9, 85 L. Ed. 2d 344, 359-60 n.9, 105 S. Ct. 1965, 1976 n.9).

However, in *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, the United States Supreme Court recognized an exception to that legal presumption and held that it does not apply to validate, under the confrontation clause, the introduction of a pretrial confession of a nontestifying codefendant which directly incriminates the defendant even though the jury is instructed to disregard it in evaluating the defendant's case. The Court reasoned:

> "[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of [its] failure [to follow them] so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. [Citations.] Such a context is presented *** where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect ***." 391 U.S. at 135-36, 20 L. Ed. 2d at 485, 88 S. Ct. at 1627-28.

As was observed by dissenting Justice White in *Bruton,* 391 U.S. 123, 141, 20 L. Ed. 2d 476, 488, 88 S. Ct. 1620, 1630-31, who was later quoted by the Court in *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056:

> "[S]uch a confession 'is hearsay, subject to all the dangers of inaccuracy which characterize hearsay generally. *** More than this, however, the [post-]arrest statements of a codefendant have traditionally been viewed with special suspicion. Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.' " 476 U.S. at 541, 90 L. Ed. 2d at 526, 106 S. Ct. at 2062.

In *Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132, a plurality of the justices decided that the *Bruton* rule did not apply to the admission of a codefendant's statement incriminating a defendant where the defendant had himself confessed, his own con-

fession was introduced against him, the confessions "interlocked," *i.e.,* were the same in all material respects, and the jury was instructed that the statements could be considered as evidence only as to their makers. The four justices interpreted *Bruton* to hold that a violation of the confrontation clause occurred only when the introduction of a codefendant's confession is devastating to the defendant's case and reasoned that where the defendant himself had confessed, his case has already been devastated and that the codefendant's interlocking confession would not have the devastating effect discussed in *Bruton* nor, under such circumstances, would cross-examination of the codefendant be of significant value to him.

Justice Blackmun and the remaining justices disagreed, subscribing to the view that while the introduction of the defendant's own confession might render a confrontation clause violation harmless in some cases—as Justice Blackmun found to be so in *Parker,* thereby producing a majority for the affirmance of the convictions (*Parker,* 442 U.S. at 80-81, 60 L. Ed. 2d at 728, 99 S. Ct. at 2143)—the introduction of the codefendant's interlocking confession nonetheless does constitute a sixth amendment violation. 442 U.S. at 77-80, 60 L. Ed. 2d at 726-28, 99 S. Ct. at 2141-43.

In *Cruz v. New York* (1987), 481 U.S. 186, 95 L. Ed. 2d 162, 107 S. Ct. 1714, the Supreme Court reconsidered the issue raised in *Parker* and expressly rejected the reasoning of the plurality therein, adopting, instead, the position espoused by Justice Blackmun and the dissenting justices. Writing for the majority, Justice Scalia explained:

> "It is impossible to imagine why there should be excluded from that category, as generally not 'devastating,' codefendant confessions that 'interlock' with the defendant's own confession. '[T]he infinite variability of inculpatory statements (whether made by defendants or codefendants), and of their likely effect on juries, makes [the assumption that an interlocking confession will preclude devastation] untenable.' [Citation.] * * *
>
> In fact, it seems to us that 'interlocking' bears a positively inverse relationship to devastation. A codefendant's confession will be relatively harmless if the incriminating story it tells is different from that which the defendant himself is alleged to have told, but enormously damaging if it confirms, in all essential respects, the defendant's alleged confession. It might be otherwise if the defendant were *standing by* his confession, in which case it could be said that the codefendant's confession does no more than support the defendant's very own case. But in the real world of criminal litigation, the defendant is seeking

to *avoid* his confession—on the ground that it was not accurately reported, or that it was not really true when made. *** Quite obviously, what the 'interlocking' nature of the codefendant's confession pertains to is not its *harmfulness* but rather its *reliability*: If it confirms essentially the same facts as the defendant's own confession it is more likely to be true. Its reliability *** may be relevant to whether the confession should (despite the lack of opportunity for cross-examination) be *admitted as evidence* against the defendant, see *Lee v. Illinois*, 476 U.S. 530 (1986), but [its reliability] cannot conceivably be relevant to whether, assuming it cannot be admitted, the jury is likely to obey the instruction to disregard it, or [whether] the jury's failure to obey is likely to be inconsequential. ***

*** This case is indistinguishable from *Bruton* with respect to those factors the Court has deemed relevant in this area: the likelihood that the instruction will be disregarded [citation]; the probability that such disregard will have a devastating effect [citation]; and the determinability of these facts in advance of trial." (Emphasis in original.) (481 U.S. at 191-93, 95 L. Ed. 2d at 171-72, 107 S. Ct. at 1718-19.)

The *Cruz* Court thus concluded that "where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant [citation], the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him." 481 U.S. at 193, 95 L. Ed. 2d at 172, 107 S. Ct. at 1719.[1]

In his original brief, which was filed one week before *Cruz* was decided, defendant took the position that the plurality decision in *Parker* did not reflect the view of the majority of the Court and, in any event, was not binding precedent in situations where a defendant takes the stand and denies the existence and/or truth of his alleged confession—as was subsequently held in *Cruz*. In his reply brief, defendant asserts that the facts here come squarely within the holding of *Cruz* in that the State introduced an unsworn, unrecorded summary prepared by the State's Attorney of Moore's statement implicating him in the events charged; that he repudiated the statement attributed

---

[1]But see *Richardson v. Marsh* (1987), 481 U.S. 200, 95 L. Ed. 2d 176, 107 S. Ct. 1702, filed the same day as *Cruz*, wherein the Supreme Court declined to extend *Bruton* to situations where a codefendant's confession is redacted to omit not merely the portions incriminating the defendant in the crime but any references whatsoever in it to the defendant's existence.

to him, testifying that it was an untruthful account of what he had told the assistant State's Attorney, which he signed only because he was tired and afraid and believed that by doing what he was told he would be released; and that the cautionary instruction that Moore's statement was not to be considered as evidence against him did not afford sufficient protection of his rights under the confrontation clause, particularly since the prosecutor attempted to countermand the instruction by inviting the jury to consider it as substantive evidence of his guilt.

■ Although the State did not address *Cruz* in its original brief, it conceded therein that a nontestifying codefendant's confession generally is inadmissible under Illinois law as evidence of another defendant's guilt (see *People v. Johnson* (1987), 116 Ill. 2d 13, 506 N.E.2d 563) and, at oral argument, that the admission of Moore's statement would be error under *Cruz—but for* the rule announced in *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056, that as long as there are sufficient "independent indicia of reliability" of the codefendant's interlocking confession, it is admissible not only against the codefendant at a joint trial but as substantive evidence against the defendant as well. The State posited that until *Lee,* "[t]here was no case law that specifically addressed the issue whether the presumptive unreliability of a codefendant's statement could ever be rebutted, permitting its introduction, even as substantive evidence, against a defendant," but that *Lee* analyzed *Bruton* "in a new light." Adhering to that position both in its written and oral response to defendant's contention that *Cruz* mandates reversal here, the State interprets *Lee* as setting forth a two-pronged test under which reliability is determined by (1) the extent to which the codefendant's statement interlocks with the defendant's and (2) the circumstances surrounding its making; and it maintains, as we discuss further below, that in this case, that test was met.

Initially, we disagree that *Lee* constitutes a change in the law or in the application of *Bruton* or that it formulates a two-pronged test which, when met, creates what the State characterized at oral argument as a "new exception to a hearsay rule." From our reading of the case, *Lee* was analyzed and decided in conformance with the long-standing recognition that there is a distinction between evidentiary and constitutional admissibility, a concept discussed at some length in *Ohio v. Roberts* (1980), 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531.

In resolving whether defendant's confrontation rights were violated by the introduction into evidence of the preliminary hearing testimony of a witness not produced at the defendant's subsequent criminal

trial, the *Roberts* court examined the relationship between the confrontation clause and the hearsay rule. The Court noted that if read literally, the confrontation clause would exclude any statements made by a declarant not present at trial, but that because such face-to-face confrontation is not always possible, the clause has been judicially interpreted to require, as an alternative, that the prosecution demonstrate that the declarant is unavailable. Even where unavailability is shown, however, the confrontation clause "countenances only hearsay marked with such trustworthiness" that it is sufficiently reliable as to be placed before the jury without confrontation of the declarant and affords the jury a satisfactory basis for evaluating the truth of the out-of-court statement. 448 U.S. at 65-66, 65 L. Ed. 2d at 607, 100 S. Ct. at 2539.

▪ The Supreme Court observed that many hearsay exceptions developed from the common law and made part of individual jurisdictions' rules of evidence rest upon such solid foundations that admission of evidence within them comports with the substance of the constitutional protection, but the Court also noted that although the two stem from the same roots and are generally designated to protect similar values, the confrontation clause nevertheless differs in significant ways from the common law rule against the introduction of hearsay and that out-of-court statements are admissible only where they bear "adequate 'indicia of reliability.' " (448 U.S. at 66, 65 L. Ed. 2d at 608, 100 S. Ct. at 2539. See also *Mancusi v. Stubbs* (1972), 408 U.S. 204, 33 L. Ed. 2d 293, 92 S. Ct. 2308; *Dutton v. Evans* (1970), 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210; *California v. Green* (1970), 399 U.S. 149, 26 L. Ed. 2d 489, 90 S. Ct. 1930; *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620; *Mattox v. United States* (1895), 156 U.S. 237, 39 L. Ed. 409, 15 S. Ct. 337.) Thus, it is clear that the "indicia of reliability" standard discussed in *Lee* with regard to the admissibility of the out-of-court statement of a nontestifying codefendant is a long-standing, fundamental requirement relating to constitutional principles as opposed to evidentiary rules, notwithstanding the similarity between and overlap of them.

▪ Second, we do not read *Lee*'s discussion of whether the confession of the codefendant in that case interlocked with the defendant's and the circumstances surrounding its making as establishing a "two-pronged test" to define what constitutes sufficient indicia of its reliability. Rather, a close reading of the opinion reveals that those were the two factors relied upon by the State as the bases for its assertion that the confession was trustworthy. In fact, we have found no case in the course of our research enumerating specific factors which, if

present, will automatically render an out-of-court declaration admissible or, conversely, that certain factors are conditions of admissibility without which the statement automatically will be excluded. Accord *Chambers v. Mississippi* (1973), 410 U.S. 284, 300-01, 35 L. Ed. 2d 297, 312, 93 S. Ct. 1038, 1048; *People v. Bowel* (1986), 111 Ill. 2d 58, 488 N.E.2d 995 (rejecting the State's argument that the presence of all four of the reliability factors discussed in *Chambers* was a condition of the admissibility of an out-of-court declaration against penal interest).

We turn then to the State's assertion that in this case, the reliability of Moore's statement was established by (a) defendant's own confession, which was virtually identical to Moore's redacted statement in describing the date, time, location and manner in which the events occurred and their respective roles in the offenses; (b) Rush's testimony fully corroborating not only the redacted version of Moore's confession but also that portion in which he stated that defendant told him to shoot Wilson; and (c) the testimony of Sean Baylis that defendant grabbed Wilson and said something after which Moore drew the gun and shot Wilson.

Notwithstanding the position it takes on appeal, it is noteworthy that the State did not seek to have Moore's alleged confession admitted against defendant at trial. Rather, after redaction of that portion of the assistant State's Attorney's summary of it wherein Moore allegedly said that defendant told him to "pop" Wilson, the confession was then admitted, under the since-rejected reasoning of *Parker,* as an "interlocking" statement with a cautionary instruction to the jury that it could be considered only as to Moore. Thus, as defendant points out, because the State did not seek to have the statement admitted against him, it did not proffer, nor did he have the opportunity to challenge prior to or at trial, the "indicia of reliability" the State now claims demonstrate its trustworthiness.

■ In any event, we note first our disagreement with the premise that the statements allegedly made by Moore and defendant were "interlocking." While it is true that the redacted summary of Moore's statement was essentially the same as defendant's, the unredacted version was critically different in that Moore directly accused defendant of having directed him to shoot Wilson, an allegation not contained in the summary of defendant's statement. That this highly incriminating accusation was omitted from the summary read to the jury may be relevant to an inquiry as discussed in *Cruz* and *Bruton,* of whether the confession of a codefendant admitted only against the codefendant was nevertheless devastating to defendant's case, but has no bearing on

the question whether the codefendant's statement is inherently trustworthy for the purpose of constitutional admissibility against the defendant himself. We cannot ignore that portion of Moore's statement which directly implicated defendant in the shooting simply because the statement as a whole was also self-incriminatory and "interlocked" with defendant's on most other points. As the Court stated in *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056, the case relied upon by the State, in rejecting a near-identical hypothesis:

> "Obviously, when codefendants' confessions are identical in all material respects, the likelihood that they are accurate is significantly increased. But a confession is not necessarily rendered reliable simply because some of the facts it contains 'interlock' with the facts in the defendant's statement. [Citation.] The true danger in this type of hearsay is, in fact, its selective reliability. As we have consistently recognized, a codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another. If those portions of the codefendant's purportedly 'interlocking' statement which bear to any significant degree on the defendant's participation in the crime are not thoroughly substantiated by the defendant's own confession, the admission of the statement poses too serious a threat to the accuracy of the verdict to be countenanced by the Sixth Amendment. In other words, when the discrepancies between the statements are not insignificant, the codefendant's confession may not be admitted." 476 U.S. at 545, 90 L. Ed. 2d at 529, 106 S. Ct. at 2064-65.

We recognize that the statement at issue in *Lee* was not redacted as was the one before us.[2] In our view, however, that is a distinction without a difference since the State's position here is founded upon the same "selective reliability" referred to in *Lee, i.e.,* that Moore's statement incriminating defendant is trustworthy and, therefore, constitutionally admissible against defendant because it "interlocks" with defendant's own statement, even though the only reason it "interlocks" is because the portion conflicting with defendant's statement regarding their respective roles in the shooting was redacted from it.

■ Clearly, Moore's statement—which, according to the assistant

---

[2]Neither, however, was it redacted to omit any reference to defendant as in *Richardson v. Marsh* (1987), 481 U.S. 200, 95 L. Ed. 2d 176, 107 S. Ct. 1702. (See footnote 1.)

State's Attorney, was not made until after defendant had been questioned—inferred that he shot Wilson only because defendant yelled "pop him" after being pushed by Wilson. Just as in *Lee,* it is possible that Moore implicated defendant to mitigate the appearance of his own culpability by spreading the blame and/or in retaliation for what he was told or might have believed defendant related to the assistant State's Attorney regarding his (Moore's) role in the shooting. In any case, we cannot say that Moore's statement was sufficiently substantiated by defendant's own statement to overcome the weighty presumption that a codefendant's statement implicating a defendant is even less reliable than ordinary hearsay and that absent the opportunity for cross-examination, its admission against the defendant violates the confrontation clause.

■ The State also asserts that the voluntariness of defendant's statement was another "indicium of reliability." We note, however, that in a confrontation clause analysis, it is the reliability of the codefendant's statement, not the defendant's, that is at issue. In any case, as was stated in *Lee,* a finding of voluntariness—or, as here, the absence of any claim of involuntariness—for fifth amendment purposes has no relevance to whether, as discussed in the preceding paragraph, the codefendant's confession was also free from any desire, motive or impulse to fabricate.

■ As to the argument that Moore's reliability was established by the testimony at trial, we note first that although the version of events testified to by Jetun Rush was similar to that in Moore's statement in numerous respects, there were also several differences both in the particulars and the general tenor. It is apparent from a comparison of the two accounts—which we summarized earlier and which formed the bases of the State's case against Moore and his defense thereto, respectively—that Rush depicted the incident as one instigated by Moore and defendant without any provocation by Wilson, whereas Moore characterized the incident as one provoked by Wilson to which he merely reacted. Regardless whether these differences are attributable to Moore's desire to mitigate his own culpability—as was argued at trial by the State—or Rush's desire to protect the reputation and/or avenge the death of Wilson, who was not only her boyfriend but also the father of her infant child—as defense counsel suggested—their existence must be acknowledged and considered in determining whether Rush's testimony served to establish the reliability of Moore's statement.

Additionally, we note that the State is correct in pointing out that Rush testified, at least three separate times, during both direct and

cross-examination, that defendant said to Moore, "[L]et's shoot this punk"; indeed, on each occasion, those were the precise words she attributed to defendant. However, according to the summary prepared by Assistant State's Attorney Brady, which Brady claimed was an accurate account of what Moore said while in custody, Moore told him that he shot Wilson because "[defendant] yelled 'pop him.'" Although the substance of the directives attributed to defendant are, admittedly, the same, the words used by Rush and Moore as purported quotes of him are notably dissimilar. Moreover, Detective Bosco testified that when he spoke to Rush after the shooting she did not say that defendant told Moore to shoot Wilson.

With respect to Sean Baylis, the sum of his testimony was that defendant approached Wilson, said something to him—which Baylis could not hear from inside the store—and then pushed him, immediately after which Moore drew the gun and shot Wilson. This testimony is consistent with defendant's and Moore's statements and Rush's testimony that defendant and Wilson engaged in reciprocal pushing prior to the shooting, but in our view, it lacks sufficient detail regarding the nature and extent of defendant's role and participation in the events to be accepted as an independent indicium of the reliability of the entirety of Moore's alleged statement directly inculpating defendant both in the armed robbery and shooting of Wilson.

In sum, when we consider that the "statements" of Moore and defendant were, in fact, prepared summaries of conversations each had with the assistant State's Attorney while in custody, as well as the divergence of those statements on the question of defendant's participation in, and accountability for, Moore's shooting of Wilson, the discrepancies between Moore's and Rush's versions of the events, and the absence of other independent guarantees of trustworthiness, we find that the State has failed to overcome the weighty presumption that Moore's statement expressly inculpating defendant in the shooting was inherently unreliable and, therefore, constitutionally inadmissible as uncross-examined evidence against him.

■■■ Having found that Moore's statement was not directly admissible against defendant and, under the holdings in *Cruz* and *Bruton* should not have been introduced even as evidence against Moore at their joint trial, the sole remaining inquiry is whether this error was harmless. After careful consideration, we are unable to conclude that it was.

Without the summary of Moore's statement, the State's evidence against defendant would have consisted primarily of Rush's testimony that, without provocation, defendant accosted Wilson, tried to rob him

and, when Wilson resisted, directed Moore to shoot him; the testimony of Baylis that defendant grabbed Wilson, said something to him and pushed him prior to Moore firing the first shot; and Brady's testimony that defendant stated that it was after Moore drew the gun while arguing with Wilson that he (defendant) approached Wilson and said, "[L]et's see if this punk has some money," and a few moments later, "[T]his punk pushed me," following which Moore shot Wilson twice.

The evidence presented in defense of the charges included defendant's testimony wherein he denied making the admissions attributed to him by Brady, stating that he neither participated in the crimes nor admitted having done so while in custody; that of Detective Bosco, whose account of what defendant told him during questioning on the night of the shooting was consistent with defendant's testimony; and Kimberly Smith's testimony that Moore acted alone in the altercation with and shooting of Wilson.

The credibility of witnesses and the weight to be given their testimony are, of course, matters for the trier of fact and we do not hold that the State's evidence was insufficient to support a guilty verdict. However, the prosecutor did not rely solely on the evidence admitted, properly or otherwise, at trial to establish defendant's guilt. Over defendant's objection, the prosecutor, in recapping the evidence, made the following remarks during closing argument:

"Now, [defendant] the evidence shows didn't just say okay, I want to cleanse my soul, I saw the shooting, I want to go to the police, I want to tell you everything about what happened because, hey, I am not involved in this. He didn't say that.

It took the police nine hours to find him; but when they found him and brought him into the police station, what did he say? You heard it from Detective Bosco.

[Defendant] said listen, I was there, I was with Leonard Whitlock * * *; oh, yes, I happened to see Billy Moore out there, just happened to see him out there.

I was just standing on the side and Billy Moore shot the guy. Billy Moore ran. I walked with [Whitlock] and we left.

The course of the investigation shows though that sometime later police, after they had arrested William Moore, talked to him who gave them the whole story. Not only did he talk about his involvement but he talked about the involvement of his buddy, [defendant].

So, then after that, you recall, John Brady went in and he talked to [defendant], told him what had been learned through the course of the investigation; and that is when [defendant]

said Okay, yes, I participated in the whole thing. I was in on the robbery. I didn't yell pop him or shoot him, I didn't say that; I did everything else.

\* \* \*

That is what he said. You will see it in the written statement, handwritten statement that you will be given of William Moore, the handwritten statement of [defendant]."

In our view, by this argument the prosecutor not only overtly invited the jury, in contravention of the trial court's instruction, to consider the redacted version of Moore's statement against defendant but also obliquely brought to their attention that portion of Moore's statement wherein he accused defendant of having "yelled, 'pop him,' " which had been ordered redacted by the court.

Thus, even assuming, *arguendo,* that the reading of the summary of Moore's redacted statement did not itself rise to the level of reversible error, we cannot say from a reading of the record in its entirety that the evidence of defendant's guilt was uncontroverted and/or so overwhelming that the constitutional violation resulting from its admission at trial, together with the prosecutor's improper remarks in closing argument, which countermanded both the trial court's instruction to the jury to disregard the statement in determining defendant's guilt or innocence and its pretrial ruling prohibiting any reference to Moore's direct implication of defendant in the shooting, did not have an effect on the verdict so as to be harmless beyond a reasonable doubt.

For the reasons stated, we reverse defendant's conviction and remand this case for a new trial.

Reversed and remanded.

LORENZ, P.J., and MURRAY, J., concur.