THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DWAYNE CURTIS *et al.*, Defendants-Appellants.

First District (4th Division)   No. 1—86—2619

Opinion filed September 28, 1989.—Appellant Rickey Jennings, rehearing
denied October 27, 1989.—Appellant Dwayne Curtis, rehearing denied No-
vember 30, 1989.

Paul P. Biebel, Jr., Public Defender, of Chicago (James N. Perlman, Assistant Public Defender, of counsel), for appellant Dwayne Curtis.

Michael J. Pelletier and Bruce Mosbacher, both of State Appellate Defender's Office, of Chicago, for appellant Rickey Jennings.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Patricia Y. Brown, and Joseph G. Laspisa, Assistant State's Attorneys, of counsel), for the People.

JUSTICE JOHNSON delivered the opinion of the court:

Following a jury trial, defendants, Dwayne Curtis and Rickey Jennings, were found guilty of attempted murder (Ill. Rev. Stat. 1985, ch. 38, pars. 8—4, 9—1), armed violence (Ill. Rev. Stat. 1985, ch. 38, par. 33A—2), three counts of aggravated battery (Ill. Rev. Stat. 1985, ch. 38, par. 12—4(a)), and conspiracy (Ill. Rev. Stat. 1985, ch. 38, par. 8—2). Defendants were sentenced to 50 years for attempted murder, 50 years for armed violence, 10 years for three counts of aggravated battery, and seven years for conspiracy to commit murder. The sentences were to be served concurrently. The following issues are raised on appeal: (1) whether defendants' joint trial was fair when their confessions, which were introduced at trial, implicated each other; (2) whether defendants were denied a fair trial by the testimony of the assistant State's Attorney of the approved charges against Jennings and the judge-issued warrant for Jennings' arrest; (3) whether defendants' conduct was exceptionally brutal and heinous to justify extended-term sentences; and (4) whether defendants' convictions for armed violence and aggravated battery should be vacated and remanded for resentencing.

We affirm in part and vacate in part and modify in part.

On October 16, 1984, at approximately 12:13 a.m., in Harvey, Illinois, Officer Denny LaBauex received a telephone call from a person identifying himself as "Mr. Jones." He told LaBauex that he saw a suspicious person lurking around his car and requested that a police unit be sent to his home at 154 West 155th Place. Officers Lawrence Patterson and Arthur Williams, assigned to separate squad cars, were both dispatched to the location. Patterson arrived first. Using his spotlight to illuminate the area, Patterson saw a red car parked in the driveway, unoccupied. He did not see anyone in the immediate area. He then proceeded to drive down 155th Street. Having seen no one in the vicinity, he returned to 154 West 155th Place. He exited the car, carrying his flashlight. As he walked down the middle of the drive-

way, he was struck in his right side by a bullet. Patterson fell to the ground and took cover behind a nearby tree. He was unable to see who fired the shot.

Officer Williams arrived at the scene shortly thereafter. He had heard the shot as he was approaching the area. Williams found Patterson on the ground with a bullet wound. They both crawled to Williams' squad car where he, by radio, requested assistance. Additional units arrived, but the police were unable to find Officer Patterson's assailant.

Patterson was treated at Ingalls Hospital. Approximately 50 to 100 pellet wounds were embedded in his right arm and the right side of his chest. Based upon the medical testimony of Dr. Massoud Nourbash, who treated Patterson's injuries, the pellets were not surgically removed since such removal would cause additional injury to his muscles and tissues.

At approximately 1:18 a.m., an evidence technician arrived at the scene to investigate the incident. A shotgun wadding was recovered from the edge of the driveway. The wadding was determined to be from a 20-gauge shotgun. Later that same day, Inspector Joseph Linkus of the Harvey police department made a cassette copy of the police emergency tape recordings, which contained the call received from Jones. Detective Edward Brooks, assigned to investigate the incident, took the tape and portable tape player into the area where the incident occurred and requested numerous individuals to listen to the recording for purposes of voice identification. On October 20, 1984, after six individuals had identified the voice on the recording, Brooks began looking for two suspects; one named Rickey Jennings and one known only as "Blow Head."

On December 15, 1984, Detective Brooks again spoke with several persons in the same area and was informed that the person known as Blow Head was also known as Curtis, his surname. While having a conversation with Officer Steven Porter, Brooks learned that Blow Head and Dwayne Curtis were one and the same person and that he resided across the street from Officer Porter. Brooks requested Porter to ask Curtis, should he see him, to come to the police station for questioning concerning the incident.

On January 10, 1985, Porter and his partner observed Curtis in the vicinity of 160th and Paulina. They approached him and asked him to accompany them to the police station for questioning concerning the shooting of an officer. Curtis agreed. While the facts surrounding the questioning are contested, it is undisputed that Detective Brooks did interview Curtis on January 10. After Curtis was informed of his

*Miranda* rights, he gave a written confession. In his own handwriting, Curtis stated that on the day in question he, Jennings, and Eugene Neal were drinking at the home of Jennings, 152 West 155th Place. They decided to shoot a police officer. They went into the basement of Jennings' house and obtained two shotguns; Curtis took the 20-gauge shotgun and Jennings took the 16-gauge shotgun. Jennings made the prank call to the police department that someone was trying to steal his car at 154 West 155th Place. All three went to the address and hid alongside the house until an officer arrived. Jennings fired the shotgun, and they all ran back to Jennings' house.

On the following day, Detective Brooks interviewed Curtis again. After being given his *Miranda* rights, Curtis gave a second written statement. In this second statement, Curtis admitted that he was the one who shot the officer. The rest of the statement remained the same.

Subsequently, Brooks contacted the felony review section of the State's Attorney's office. Assistant State's Attorney Richard Cosentino came to the police station and was given a copy of Curtis' second statement. Curtis was again given his *Miranda* warnings before making an oral statement to Cosentino. Cosentino asked Curtis if he would reduce his oral statement to writing. Curtis agreed. Cosentino drafted the statement and gave a copy to Curtis for correction of any inaccuracies. Curtis signed the statement without making any corrections. This statement was essentially the same as the second statement.

At approximately 9 p.m. on the same day, January 11, at the request of Cosentino, Curtis agreed to give a court-reported statement. This statement was also essentially the same as the previous two. In this statement Curtis stated that they had decided to shoot a policeman because the Harvey police department had been "hassling" them. Cosentino asked Curtis had he been forced, abused, or threatened to give the statements. He responded in the negative. Cosentino testified that he did not see any evidence of injury to Curtis. Thereafter, an arrest warrant was prepared and signed by a judge, authorizing the arrest of Jennings.

On April 17, 1985, Detective Brooks observed Jennings in the area of 157th and Lincoln Highway, in Harvey. He approached Jennings, identified himself as a police officer, and asked him his name. Jennings gave a fictitious name; however, because he fit the description of one of the persons involved in the shooting, he was taken to the police station. He admitted, en route to the station, that he was, in fact, Rickey Jennings.

At the police station Jennings was informed of his *Miranda* rights. He then gave an oral statement to Assistant State's Attorney David Baitman. Jennings agreed to allow Baitman to reduce the statement to writing. After having the opportunity to review the statement for accuracy, Jennings signed it. His statement contained essentially the same information as the statements given by Curtis. He admitted burying the shotguns in a field behind his house. Jennings also stated that Curtis shot the police officer. The People rested their case.

Jennings neither testified nor presented any witnesses at trial. Curtis testified in his own behalf. He admitted being at Jennings' house with Neal on the night in question; however, he denied that anyone left the house to shoot a police officer. He further alleged that Detective Brooks and other policemen used threats of force and actually repeatedly beat him to make him confess. On cross-examination he admitted that he did not inform the assistant State's Attorney of the beatings. The attorney for Neal saw Curtis in a cell through a window. He saw no evidence that he had been mistreated. Both the court reporter who transcribed Curtis' fourth written statement and the medical technician who examines incoming inmates testified that Curtis did not appear physically or mentally abused. Brooks testified that he did not threaten, force, or beat Curtis in order to elicit a confession.

After hearing all of the evidence, the jury found both defendants guilty. The court found the extended-term sentence provision applicable based on a finding that the offenses were exceptionally brutal and heinous behavior indicative of wanton cruelty. Accordingly, the court sentenced them each to 50 years for attempted murder, 50 years for armed violence, 10 years for three counts of aggravated battery, and seven years for conspiracy to commit murder. All sentences were to be served concurrently. This appeal followed.

Defendants contend that they were denied a fair trial. Relying on *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056, and *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, Curtis argues that his sixth amendment right to confrontation was denied when the statement given by his nontestifying codefendant (Jennings) was admitted into evidence which implicated him in the crime. Therefore, Curtis claims that his trial should have been severed. Jennings argues that the introduction into evidence of the four statements of his codefendant (Curtis) which implicated him in the offense denied him a fair trial.

■ In *Bruton*, the Court held that a defendant is deprived of his

rights under the confrontation clause of the sixth amendment when his codefendant's incriminating confession is admitted into evidence at their joint trial, despite jury instructions that the confession is admissible only against the codefendant. (*Bruton*, 391 U.S. at 132, 20 L. Ed. 2d at 483, 88 S. Ct. at 1625-26.) In the plurality decision of *Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132, the Court found that the confrontation clause was not violated if both defendants confessed, the confessions interlocked as to material facts, thereby reducing the prejudicial effect, and the jury was properly instructed. However, in *Lee*, the Court held that a codefendant's confession is not necessarily reliable merely because some facts interlock with defendant's statement. Finally, in *Cruz v. New York* (1987), 481 U.S. 186, 95 L. Ed. 2d 162, 107 S. Ct. 1714, the Court overruled the plurality decision in *Parker*. Consistent with *Lee*, the Court found that the interlocking nature of confessions is not relevant in determining whether jury instructions can or will be obeyed. (*Cruz*, 481 U.S. at 193, 95 L. Ed. 2d at 171, 107 S. Ct. at 1718-19.) The Court stated:

> "Quite obviously what the 'interlocking' nature of the codefendant's confession pertains to is not its *harmfulness* but rather *its reliability*: If it confirms essentially the same facts as the defendant's own confession it is more likely to be true. Its reliability, however, may be relevant to whether the confession should (despite the lack of opportunity for cross-examination) be *admitted* as evidence against the defendant. [Citation]. (Emphasis in original.) (*Cruz*, 481 U.S. at 192-93, 95 L. Ed. 2d at 171, 107 S. Ct. at 1718-19.)

Accordingly, the Court held that a "defendant's confession may be considered at trial in assessing whether his codefendant's statements are supported by sufficient 'indicia of reliability' to be directly admissible against him *** despite the lack of opportunity for cross-examination." *Cruz*, 481 U.S. at 193-94, 95 L. Ed. 2d at 172, 107 S. Ct. at 1719.

We find very few discrepancies between the statements of Curtis and Jennings. The only readily apparent inconsistency is where Curtis, in his first statement, denied shooting the police officer. However, after Detective Brooks informed him that his statement was inconsistent with the information he had obtained in his investigation, Curtis admitted using a 20-gauge shotgun to shoot the officer. The three subsequent statements made by Curtis all reiterated that he had a 20-gauge shotgun and that he was the one who shot the officer.

The confessions not only stated that Curtis shot the police officer,

but they substantiated each other in essentially all respects to rebut the presumption of unreliability of a codefendant's confession. Each statement noted that Curtis, Jennings, and Neal were at Jennings' house on the night in question; they all agreed to shoot a police officer; Jennings placed the prank call to the police station in order to lure a police officer to the area; Jennings went into his basement and obtained two shotguns, one a 16-gauge and the other a 20-gauge; Curtis took the 20-gauge shotgun and Jennings took the other; Curtis and Jennings hid alongside the house at 154 West 155th Place, the address to which Patterson was dispatched; Neal was the look-out person; when Patterson arrived Curtis shot him, and they all ran back to Jennings' house; Jennings, thereafter, hid the weapons.

■■ ■ We find that Curtis' sixth amendment rights were not violated. Jennings' statement implicating Curtis was supported by sufficient indicia of reliability to be directly admissible against Curtis, despite the fact that he did not have an opportunity to cross-examine Jennings. We also find the same sufficient indicia of reliability present in the four statements given by Curtis implicating Jennings in the offense. Generally, defendants jointly indicted are jointly tried unless prejudice to one defendant mandates severance. (*People v. Daugherty* (1984), 102 Ill. 2d 533, 541-42.) In ruling on a motion for severance, the court must determine the likelihood of prejudice at trial, and absent an abuse of discretion, the trial court's decision will not be reversed. (*Daugherty*, 102 Ill. 2d at 541.) We find no such abuse in the present case.

■■ In addition to analysis under the sixth amendment, we must also examine the admissibility of Curtis' confession against Jennings under Illinois evidentiary law. In *Lee v. Illinois* (1986), 476 U.S. 530, 539, 90 L. Ed. 2d 514, 525, 106 S. Ct. 2056, 2061, the Court recognized that the sixth amendment analysis is distinct from an analysis under applicable State law with reference to the admissibility of codefendant's confessions. The law is well settled in Illinois that codefendant's statements which incriminate the defendant are incompetent evidence against the defendant, unless an exception to the hearsay rule is applicable. *People v. Duncan* (1988), 124 Ill. 2d 400, 413-14.

Jennings argues that the four statements of Curtis put into evidence implicating him in the offense constituted inadmissible hearsay evidence, therefore denying him a fair trial. In *People v. Spicer* (1979), 79 Ill. 2d 173, defendants Edward Spicer and James Phillips were jointly indicted. While in police custody, Phillips gave an unsworn signed statement implicating Spicer in the offenses charged. Phillips testified as a State witness in Spicer's trial. Phillips acknowl-

edged that he had signed the statement and that he had told the truth. Spicer's attorney objected to the admission of the statement, but he did not cross-examine Phillips. The court held that the statements made by a witness out of court and out of the presence of a jury are "incompetent" hearsay. (*Spicer*, 79 Ill. 2d at 180.) Nevertheless, the court found that admitting Phillip's statement was not reversible error, since the other evidence in the record established his guilt beyond a reasonable doubt. *Spicer*, 79 Ill. 2d at 182-83.

■ We find that the admission of Curtis' statements was harmless error. The other evidence in the record was sufficient to establish Jennings' guilt beyond a reasonable doubt. Although Jennings did not testify, his statement where he admitted participating in the offense was put into evidence. As mentioned above, his statement was essentially the same as those statements provided by Curtis. Jennings' claim that he was forced to make and sign the statement is not an issue here on appeal. Thus, we find that both defendants were granted a fair trial.

Defendants' next contention is that they were denied a fair trial by the testimony of the assistant State's Attorney concerning the approved charges against Jennings and a judge-issued warrant for his arrest. Over defendants' objections, Detective Brooks testified that subsequent to Curtis' fourth statement he proceeded to procure a search warrant for Jennings. He explained that all felony charges require approval from the office of the State's Attorney before a warrant can be issued. Therefore, he prepared an affidavit for an arrest warrant for Jennings, which was approved. He further testified that a judge issued the warrant for Jennings' arrest. Defendants claim this testimony places a judicial *imprimatur* of guilt on them in the presence of the jury and, thus, is prejudicial.

Defendants rely on *People v. Turner* (1984), 127 Ill. App. 3d 784, and *People v. Blissitt* (1973), 12 Ill. App. 3d 551, to support their contention. In each case an assistant State's Attorney testified that, based upon the information he had obtained, he recommended that charges be brought against the defendant. Each case held that it was improper and prejudicial error for a prosecutor to offer to the jury his belief that the defendant would not have been charged unless he was guilty.

■ Unlike *Turner* and *Blissitt*, in the instant case, it was not an assistant State's Attorney testifying, but a member of the police department. As stated earlier, Detective Brooks had no authority to place charges against Jennings. Moreover, Detective Brooks was not testifying as to his personal opinion concerning Jennings' guilt or in-

nocence, as were the circumstances in *Turner* and *Blissitt*. He was merely testifying to the procedures required to obtain an arrest warrant. Even the prosecutor's remarks are not reversible error unless defendant is substantially prejudiced thereby. (*Turner*, 127 Ill. App. 3d at 792.) The defendants do not provide nor do we find any evidence of prejudice to them. Hence, Detective Brooks' testimony did not deny defendants a fair trial.

Defendants next contend that the trial court erred in sentencing them to extended-term sentences, pursuant to section 5—8—2 of the Uniform Code of Corrections (hereinafter the Code) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2). They argue that their conduct was not exceptionally brutal and heinous so as to justify extended-term sentences.

■ The statutory extended-term provision relevant in this case authorizes the trial court to impose an extended-term sentence if the defendant has been convicted of a felony "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2).) The sentence for a defendant convicted of either attempted murder or armed violence, both felonies, is 30 to 60 years if certain aggravating factors exist. One such aggravating factor is behavior that is exceptionally brutal or heinous indicative of wanton cruelty. Ill. Rev. Stat. 1985, ch. 38, pars. 1005—8—2(a), 1005—5—3.2(b)(2).

■■ ■ Exceptionally brutal or heinous behavior indicative of wanton cruelty does not require the application of torture or unnecessary pain inflicted upon the victim. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 501.) The following factors have been demonstrative of such behavior: "defendant's premeditated, senseless act in shooting the victim ***; the absence of any immediate provocation by the *** victim; *** defendant's shooting of the victim with a shotgun at close range which obviously would result in death or grave and permanent injury to the victim." (*People v. McGee* (1984), 121 Ill. App. 3d 1086, 1091.) Accordingly, the following law is clear in Illinois:

> "[T]he trial judge is normally in a better position to determine the punishment to be imposed than the courts of review. [Citations.] A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case. [Citation.] Such judgment depends upon many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154.)

Thus, the trial court's sentence is granted great deference and

weight, and absent an abuse of discretion, its sentence shall not be altered on review. *Perruquet*, 68 Ill. 2d at 154.

■■■ Here, defendants exemplified exceptionally brutal or heinous behavior indicative of wanton cruelty. Without any logical reason, defendants decided to shoot a police officer. Upon this decision they conspiringly set out to go forth with their plan. A police officer was lured to the area by a prank call placed by Jennings. Jennings supplied the weapons. They hid and waited for a policeman to arrive. Once the policeman arrived, Curtis shot him without regard to the possible fatality of his shot. Clearly, the senselessness, the premeditation, the possible fatality of such an act of violence evidence to this court exceptionally heinous behavior indicative of wanton cruelty.

■■■ Finally, the State concedes that it was error to impose extended-term sentences for armed violence and for aggravated battery when extended-term sentences were also imposed for attempted murder. Rather than remand this case for resentencing, we will vacate defendants' extended-term sentences and convictions for armed violence (see *People v. Payne* (1983), 98 Ill. 2d 45) and vacate their extended-term sentences for aggravated battery and modify the sentences to five years (see *People v. Jordan* (1984), 103 Ill. 2d 192). We find no need to remand this cause for resentencing on the remaining convictions.

Accordingly, defendants' 50-year extended-term sentences for attempted murder and their seven-year sentences for conspiracy to commit murder are affirmed; the convictions and extended-term sentences for armed violence are vacated; and the 10-year extended-term sentences for aggravated battery are vacated and the sentences are modified to five years. As part of our judgment, we grant the State's request that defendants be assessed $75 as costs and fees for this appeal, pursuant to *People v. Agnew* (1985), 105 Ill. 2d 275, and *People v. Nicholls* (1978), 71 Ill. 2d 166.

Affirmed in part and vacated in part and modified in part.

LINN and McMORROW, JJ., concur.