THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM MOORE, Defendant-Appellant.

First District (5th Division)   No. 1—90—2675

Opinion filed May 1, 1992.

Thomas Peter, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Michael P. Latz, and Michael Falagario, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

Following a joint jury trial, defendant William Moore (Moore) and Omar Dixon (Dixon) were found guilty of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)) and attempted armed robbery (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4, 18—2). Moore was sentenced to concurrent terms of 40 years for murder and 10 years for attempted armed robbery.

Moore was arrested on November 20, 1984, and subsequently charged with attempted armed robbery and murder. A guilty verdict was returned on October 11, 1985. Post-trial motions were heard and denied, and on November 22, 1985, defendant was sentenced to 40 years in the Illinois Department of Corrections.

The reason this case took so much time to arrive in the appellate court was that Moore's trial attorney failed to file a notice of appeal from Moore's conviction and sentence. When Moore finally learned that he did not have an appeal pending, he filed a post-conviction petition. That petition was granted pursuant to *People v. Wilk* (1988), 124 Ill. 2d 93, 529 N.E.2d 218, and *People v. Moore* (1990), 133 Ill. 2d 331, 549 N.E.2d 1257, and in doing so defendant was granted leave to file a late notice of appeal. On September 10, 1990, the notice of appeal was filed in accordance with the ruling of the trial court on Moore's post-conviction petition.

On appeal defendant contends (1) that the jury was erroneously instructed on the propriety of the use of deadly force, (2) that the trial court committed reversible error when it admitted the hearsay statements made by a codefendant without redacting all references to defendant and without giving the jury a proper, timely instruction, and (3) the trial court erred when it imposed the maximum sentence on a 16-year-old with no prior record.

The charges arose out of the fatal shooting of 17-year-old Benjamin Wilson (Wilson) on November 20, 1984. The facts are as follows.

At trial, 17-year-old Jetun Rush (Jetun) testified that at about 12:30 p.m. she and Wilson, who was her boyfriend and the father of their child, left Simeon Vocational High School (Simeon) where they were both students and began walking north on Vincennes Avenue. They noticed a group of boys and girls standing on the grass and the sidewalk in front of a store about one-half block from the school. By the time they reached the group, the girls had walked away, leaving about five or six boys gathered on and next to the sidewalk. Moore was standing close to the fence and Dixon was standing nearby on the grass. Attempting to make their way around the group, Wilson said,

"[E]xcuse me." Moore turned around and asked Wilson what he had said. Wilson repeated, "[E]xcuse me," and continued walking another four or five feet. At that point, a taller boy (identified as Dixon) stepped in front of Wilson, grabbed him by his jacket and said, "[S]ay, man, you got any money?" Wilson pushed him away responding, "Say man, you think you're tough?" Dixon repeated his demand for money and reached into his pockets. Wilson pushed him away again, asking, "[W]hat are you going to do, shoot me?" Dixon responded, "You still think you're tough. Let's shoot this punk." Whereupon she heard the first shot fired by Moore. As Wilson tried to dodge away, Jetun saw Moore shoot him a second time, after which he fell into her arms. Dixon then exhorted Moore, "Let's go. Here come the police." Both Moore and Dixon ran from the scene. After she sat Wilson down next to the fence, she ran back to the school and the police and an ambulance were summoned. Later that evening, Jetun viewed two lineups and identified both Moore and Dixon as the offenders.

On cross-examination, Jetun repeatedly denied that Wilson had argued with Moore; however, she acknowledged telling the responding officers that Wilson bumped into one of the boys and that there had been a verbal altercation. She further stated that, having seen the gun in Moore's waistband when he first turned around, she warned Wilson and admonished him, "[L]et's go," but she did not attempt to physically pull him away, and that each time she was asked to describe what had occurred, she told the police that Dixon had said to Moore, "[L]et's shoot this punk."

Detective Bosco testified that when he questioned Dixon following his arrest later that evening Dixon told him that he was standing in front of the store with his friend Leonard Whitlock (Whitlock) when Wilson, who had been walking with his girl friend, bumped into Moore. An argument ensued and it appeared that Wilson intended to fight. At that point, Moore produced a handgun and shot Wilson twice. Dixon told him that at no time did he see a weapon in the victim's hand. As he (Dixon) and Whitlock walked away, he observed Moore running from the scene. On cross-examination, Bosco stated that when he interviewed Jetun a few hours after the shooting, she told him that there had been an argument but she did not say that she saw a gun prior to the time Moore fired it at Wilson. Neither did she tell him that Dixon told Moore to shoot Wilson, but it was his (Bosco's) belief that she related that information to another officer, Detective McGuire, who did not testify at trial.

Sean Baylis (Baylis), a student at Simeon, testified that he was walking toward the store when he saw defendant and Whitlock, both

of whom he knew from the neighborhood, and two other boys standing near the school gate. After exchanging a greeting, he proceeded to the store to play some video games. A short time later, Dixon and the three other boys came into the store for a few minutes and then left. He identified Moore as one of the boys that was present. While his companion took his turn on the video game, he sat down near the front window of the store. He saw Dixon approach Wilson, grab his arm, say something and then push Wilson back toward the store window. Moore then pulled out a gun and shot Wilson. Wilson walked behind a tree in front of the store but when he came from around it, Moore shot him a second time.

On cross-examination, Baylis stated that it was when he heard a bump against the store window that his attention was drawn to the scene in front of the store. After the shooting, a tall boy came to Wilson's aid. Baylis immediately returned to school without saying anything to anyone, but later after another student had informed the police that he (Baylis) had witnessed the shooting, he was summoned to the principal's office, where he told the assistant principal and two police officers what he had witnessed. Later that evening, he repeated the same information three different times to plainclothes officers at the police station.

John Everett, the assistant principal of Simeon, testified that when he was informed that Wilson had been shot, he went to the scene, where he saw several students surrounding Wilson, attempting to comfort him. He spoke with Baylis, who was among the students on the scene, but because Baylis appeared to be somewhat stunned, he took him back to his office at the school. There, Baylis told him, in the presence of the school's youth officer and another Chicago police officer, that two boys, one of whom he knew as "Omar," had confronted Wilson outside the store. Baylis did not mention that any pushing had occurred or that Wilson had run behind a tree after the first shot.

John Brady, an assistant State's Attorney assigned to felony review on the night of the shooting, testified that he first questioned Moore at 2 a.m. on November 21, 1984. He had an additional conversation with Moore at which time a written summary was taken regarding the shooting of Ben Wilson.

According to the summary, which Brady read from the witness stand, Moore stated that on the morning of the shooting, he met Whitlock, his cousin, Eddie Thompson, and Dixon at Calumet High School, where they were students. They discussed an incident in which $10 had been taken from Thompson's sister, Cynthia, at Simeon

the previous day. Moore told Whitlock that he was going to Thompson's house to get a gun and would meet him (Whitlock) back at school afterward. Later, the four of them took a bus to Simeon and walked to a video game room where they met some girls they knew. From there, he, Whitlock and Dixon walked to a second game room on Vincennes Avenue. As he was standing on the sidewalk talking to a girl named Kim, he was bumped in the back. He turned around and saw Wilson, whom he had seen play basketball at Simeon the previous year. Moore asked, "[W]hat's going on, tall boy?" to which Wilson replied, "[F]--- you." Moore responded in kind and in the course of the argument that ensued, he drew the .22 caliber pistol he had taken from Thompson's house. At that point, Dixon said, "[L]et's see if this punk has some money," and attempted to reach into Wilson's pockets. Wilson asked, "What are you going to do, shoot me?" Dixon then pushed Wilson and Wilson pushed him back. Moore fired two shots at Wilson. He, Whitlock and Dixon then ran from the scene. He gave the gun to Dixon, who told him Thompson took it. Later he saw Thompson and asked about the gun. Thompson told him that he had "put it up somewhere." The only portion of Brady's summary not read to the jury was Moore's statement that after being pushed by Wilson, "[Dixon] yelled, pop him!" that excerpt having been ordered redacted by the trial court.

Brady further testified that he first spoke with Dixon at 11 p.m. on November 20, 1984. He also prepared a handwritten summary of the statement made by Dixon during a conversation with him at about 3:25 a.m. on November 21, 1984, a few minutes after his second meeting with Moore. According to Brady's summary, which he also read during his direct examination, Dixon's account of the events of the morning of November 20 was virtually identical to Moore's. Regarding the incident involving the $10 taken from Thompson's sister the day before, Dixon added that when they saw Kim and Erica at the video game room, the girls told them that the person who had taken the money from Cynthia was an older boy who was not a student at Simeon. He, Moore and Whitlock then walked to the store on Vincennes Avenue. As they were standing on the sidewalk talking, a tall boy (Wilson) bumped into Moore. Wilson and Moore began to argue and Moore pulled out a gun. Wilson asked, "[A]re you going to shoot me?" Dixon then said, "[L]et's see if this punk has some money," and walked toward Wilson whereupon Wilson pushed him. Then he said to Moore, "[T]his punk pushed me." Moore pulled out a gun and shot Wilson twice. They then ran from the scene. Later, they drove to Moore's house and waited in the car while Thompson hid the

gun somewhere in the backyard. Brady testified that each summary was read and signed by Moore and Dixon, respectively.

On cross-examination, Brady reiterated that the summaries were not verbatim accounts of Dixon's and Moore's statements but stated that they both had refused to give a sworn, court-reported statement. He also acknowledged, on cross-examination by counsel for Moore, that in his summary of his conversation with Moore, he excluded as being irrelevant Moore's statement that the person who took the $10 from Thompson's sister had put the money down the front of his pants and told her that she would have to take the money out of his pants if she wanted it back and that it was because of that incident that Moore decided to take the gun from Thompson's house.

Kimberly Smith (Kim) testified that Dixon, Moore, Whitlock, Thompson and Marcellus Hunter (Hunter), all of whom she knew from her neighborhood, were walking past the store as she and a classmate approached it during their lunch period. They stopped in front of the store, and while she was talking to Hunter, she saw a boy and a girl (Wilson and Jetun) walk through the group. As they did, she noticed that Moore "fell back," after which Moore and Wilson began to argue. Jetun unsuccessfully tried twice to pull Wilson away. During the argument, Moore and Wilson stepped closer to each other but then Moore took two steps backward. It was at that point that she heard a loud noise. She saw Wilson bending over and then ran back to school.

On cross-examination by the State, Kim acknowledged that after the shooting she did not tell anyone what she had seen. On cross-examination by Dixon, she stated that she had asked Whitlock to "cool out the argument" because she was afraid that something was going to happen, and that just after that, she heard the loud noise. At no time did she see Dixon or Wilson push the other nor did she hear Dixon say anything to Moore or put his hands into Wilson's pockets. Neither did she hear Wilson say "What are you going to do, shoot me?" nor see anyone holding a gun.

Dixon testified on his own behalf. He testified that on the morning of the shooting, he and Moore met near their lockers at Calumet High School and agreed to skip their classes and go to Thompson's house, where they ate breakfast and spent the morning watching television. While there Moore and Thompson told him about the incident involving the taking of money from Thompson's sister, Cynthia, but there was no discussion of seeking revenge or of confronting a person known as "Iceberg." Just before leaving Thompson's house, sometime after 11 a.m., Moore came down the stairs and showed him a small gun. Moore then went back upstairs with the gun and a short time

later he came down with his coat and they left. He, Moore and Thompson returned to their school, where they met Whitlock, and then took a bus to Simeon to see some friends. They went to a video game room on 81st Street and Normal Avenue, played a few video games and, after about 10 minutes, he and Moore walked Erica back to school. From there they walked to a store on Vincennes Avenue where they were rejoined by Whitlock, Erica, Kimberly Smith and Marcellus Hunter. As he was standing in the grass talking to Whitlock, a tall boy and a girl (Wilson and Jetun) walked up to the group. Dixon did not know either Wilson or Jetun. He then saw Moore "bounce off the fence" as though he had been bumped into it and subsequently heard Moore ask Wilson for an apology. Wilson said, "I don't owe you no type of apology. F--- you." Moore responded in kind. The girl attempted to pull Wilson away, but he pulled away from her and continued arguing with Moore. It appeared to him that Wilson and Moore might begin to fight, and he would have helped Moore if a fight had occurred, but because there was no physical contact between them he did not intervene. He did not grab, push or touch Wilson in any way nor did he say anything to Wilson or to Moore prior to the shooting. Rather, he testified, it was Wilson who began walking toward Moore, at which point he heard two gunshots. He did not see the gun nor did he know that Moore had been carrying it. He immediately ran from the scene and boarded a bus on 79th and Vincennes. Moore and Whitlock boarded the same bus at the next stop.

When Dixon arrived home shortly after 9 p.m. that evening, the police grabbed him, handcuffed him and, after stops at Moore's and Whitlock's homes, they took him to the police station. Later that evening, he stood in a lineup and was then placed in a room alone. About one-half hour later, Brady and a police officer came in to question him. He told Brady that Moore "was in an incident with this guy and that he [Moore] had shot him." After appearing in several more lineups, he was taken back to the room where he remained alone for several hours until Brady returned and told him that his previous statement was a lie and that there was "more to it." When he told Brady that what he had related was true, Brady left. A few minutes later he was taken to another room where he remained most of the night. At about 3:30 a.m. Brady, accompanied by two police officers, came in with a prepared written statement and told him to read it and sign it. Although the statement was not true, he signed it because he had not slept, eaten or talked to anyone while at the police station and was very tired and afraid and "just wanted to get it over with." No one asked him if he wanted to make a court-reported state-

ment nor was he told that he was under arrest for any crime. He believed that he had been brought in only for questioning and it was not until about 6 a.m. that Brady informed him that he was under arrest for murder.

On cross-examination by the State, Dixon denied that he left school that morning to get a gun. He also specifically denied the truth of the statements attributed to him in Brady's summary regarding his involvement and participation in the events immediately preceding and following the shooting.

Moore's uncle was the only witness called on his behalf, testifying to Moore's background and character. Moore expressly waived his right to testify.

Following argument by counsel, the jury found Moore and Dixon guilty of murder and attempted armed robbery.

## I

In the first of three points, Moore argues that the jury that convicted him was erroneously instructed that Moore could not use deadly force unless he reasonably believed he was in danger of death or great bodily harm. He argues that deadly force may be used to prevent the commission of a forcible felony.

Defendant relies on *People v. Garcia* (1988), 169 Ill. App. 3d 618, 523 N.E.2d 992, where the court held that committing a battery while on a public way constitutes an aggravated battery. In *Garcia* failure to give a jury instruction on the use of deadly force to resist this type of aggravated battery was reversible error. Defendant argues that since defendant presented evidence that Ben Wilson provoked the incident, had committed an aggravated battery, and was threatening to commit another aggravated battery, a jury instruction on the use of deadly force to prevent the commission of a forcible felony should have been given. Defendant maintains that failure to give that instruction in *Garcia* was reversible error and thus it is reversible error in this case. However, we note the court in *Garcia* concluded its analysis of the issue by stating:

> "Failure to give this instruction, *when tendered by the defendant*, deprived the defendant of a defense that existed under the law. This resulting denial of due process requires that defendant be granted a new trial." (Emphasis added.) (*Garcia*, 169 Ill. App. 3d at 621, 523 N.E.2d at 994.)

Apparently in *Garcia* an instruction was tendered and denied. In the present case no such instruction was tendered.

The burden of preparing jury instructions is on the parties, and a party may not raise the failure to give an instruction on appeal unless he shall have tendered it. (*People v. Underwood* (1978), 72 Ill. 2d 124, 378 N.E.2d 513.) Generally, the failure to make an objection at trial to an error in the jury instruction constitutes a waiver of the error, if any exists. (*People v. Chapman* (1981), 94 Ill. App. 3d 602, 418 N.E.2d 995.) We note that the court in *Garcia* in analyzing another jury instruction issue recognized the aforementioned principles citing both *Underwood* and *Chapman*. *Garcia*, 169 Ill. App. 3d at 621, 523 N.E.2d at 994.

■ Moore's trial defense counsel did not object to the People's instruction on the justification to the use of force, nor did he tender any other instruction on self-defense. We find that the issue is waived.

Finally, even if the point was not waived in this case the error is harmless in light of the overwhelming evidence of Moore's guilt. "A refusal to give an instruction will be held to be harmless and not a ground for reversal where it can be said that the result of the trial would not have been different if the instruction had been given." (*People v. Moore* (1983), 95 Ill. 2d 404, 410, 447 N.E.2d 1327.) Considering the quantum of the State's evidence, we conclude that the jury's verdict would have been the same.

## II

In his second point Moore claims the introduction of a statement made by his codefendant, Dixon, to the State's Attorney confessing his part in the crime without a limiting instruction was error requiring a reversal of Moore's conviction. Dixon's confession was read to the jury. Dixon testified and admitted he read and signed the confession but denied the contents contained therein.

The confrontation clause of the sixth and fourteenth amendments guarantees the right of a criminal defendant to be confronted with the witnesses against him, including the right to cross-examine those witnesses. (*Cruz v. New York* (1987), 481 U.S. 186, 189, 95 L. Ed. 2d 162, 169, 107 S. Ct. 1714, 1717.) However, no sixth amendment confrontation violation occurred by the introduction of Dixon's confession because Dixon testified at trial and was subject to cross-examination. *Bruton v. United States* (1968), 391 U.S. 123, 136, 20 L. Ed. 2d 476, 485, 88 S. Ct. 1620, 1628; *Nelson v. O'Neil* (1971), 402 U.S. 622, 627, 29 L. Ed. 2d 222, 227, 91 S. Ct. 1723, 1726-27; *People v. Moman* (1990), 201 Ill. App. 3d 293, 304, 558 N.E.2d 1231.

Moore asserts that Dixon's out-of-court statement implicating him is inadmissible against him because it is incompetent hearsay evi-

dence. In *Lee v. Illinois* (1986), 476 U.S. 530, 543, 90 L. Ed. 2d 514, 527-28, 106 S. Ct. 2056, 2063, the United States Supreme Court indicated that even where the hearsay evidence does not fall within a firmly rooted hearsay exception, the confrontation clause would not be violated by an unavailable codefendant's confession that has an "independent indicia of reliability" to overcome the presumption of unreliability placed upon an accomplice's incriminating confession. *Lee* suggested that interlocking confessions may provide the independent indicia of reliability required to overcome the presumption of unreliability of an accomplice's confession. (*Lee*, 476 U.S. at 545, 90 L. Ed. 2d at 529, 106 S. Ct. at 2064.) However, *Lee* recognized that even if the confession meets the "*Lee* test" for admissibility under the sixth amendment analysis, State hearsay rules could act independently of the confrontation clause to preclude admission of codefendants' reliable confessions. *Lee*, 476 U.S. at 539, 90 L. Ed. 2d at 525, 106 S. Ct. at 2061.

■ Under Illinois law, a codefendant's statements are generally inadmissible as hearsay against a defendant, unless the statements were made in the presence of the defendant or assented to by him. (*People v. Collins* (1989), 184 Ill. App. 3d 321, 539 N.E.2d 736.) In *People v. Curtis* (1989), 190 Ill. App. 3d 207, 214, 546 N.E.2d 624, 628, and *People v. Collins* (1989), 184 Ill. App. 3d 321, 329, 539 N.E.2d 736, 741, the Illinois Appellate Court held that statements that incriminate the defendant are incompetent evidence against the defendant, unless an exception to the hearsay rule is applicable. In *People v. Duncan* (1988), 124 Ill. 2d 400, 414, 530 N.E.2d 423, the court referring to a codefendant's statement indicated, "Unless some other exception to the hearsay rule applied, we have allowed admission of such statements at joint trials only reluctantly, only with proper limiting instructions, and only if the statements are cleansed of all references to a nondeclaring defendant." In *People v. Moman* (1990), 201 Ill. App. 3d 293, 558 N.E.2d 1231, the court indicated that until the Illinois Supreme Court rules otherwise, it will follow the appellate courts in this district (having previously referred to *Curtis* and *Collins*) finding the fact that a confession is interlocking under *Lee* does not render the confession admissible under Illinois evidentiary analysis. We must follow the holdings of the first district of the appellate court. Therefore, we must find that it was error under Illinois evidentiary law to admit Dixon's statement without redacting all references to the defendant.

However, a finding that it was error under Illinois evidentiary law to admit a codefendant's confession at defendant's trial without re-

dacting all references to defendant does not necessarily dispose of the issue. We must next determine whether the error may be deemed harmless. *Moman*, 201 Ill. App. 3d at 308.

The State argues that even if the trial court erroneously considered the codefendant's statement against the defendant, the error was harmless. When a trial error affects a Federal constitutional right, it is reversible error unless it is harmless beyond a reasonable doubt. (*People v. Owens* (1984), 102 Ill. 2d 88, 104, 464 N.E.2d 261.) The sufficiency of the evidence proving guilt beyond a reasonable doubt must be considered in determining whether the error was harmless. (*People v. Macfarland* (1992), 228 Ill. App. 3d 107, 121.) If the evidence of the defendant's guilt is uncontroverted and/or so overwhelming that the constitutional violation resulting from its admission at trial did not have an effect on the verdict, then the error is harmless beyond a reasonable doubt. *People v. Dixon* (1988), 169 Ill. App. 3d 959, 978, 523 N.E.2d 1160.

Notwithstanding the fact that this court found that the evidence in *Dixon* was not harmless beyond a reasonable doubt, we find the facts distinguishable as they relate to Moore. Moore did not testify at the parties' joint trial, and this court held that absent the opportunity for cross-examination, the admission of Moore's statement against Dixon violated the confrontation clause. (*Dixon*, 169 Ill. App. 3d 959, 523 N.E.2d 1160.) Dixon testified at trial, admitting that he read and signed his confession, but maintained that the statement was untrue and that he signed the statement only because he was tired and the assistant State's Attorney told him to sign it. Moore's counsel had the opportunity to cross-examine Dixon. Moreover, in *Dixon*, this court referring to the prosecutor's closing argument stated, "the prosecutor not only overtly invited the jury, in contravention of the trial court's instruction, to consider the redacted version of Moore's statement against [Dixon] but also obliquely brought to their attention that portion of Moore's statement wherein he accused defendant of having 'yelled, "pop him," ' which had been ordered redacted by the court." *Dixon*, 169 Ill. App. 3d at 978.

In *People v. Moman* (1990), 201 Ill. App. 3d 293, 558 N.E.2d 1231, the confession of a testifying codefendant was admitted. The court held that there was no confrontation violation due to the fact the codefendant testified. The court found that the admission of the codefendant's confession without redacting all references to the defendant was error. The court found no basis for overlooking the fact that the codefendant was subject to full and effective cross-examination at trial and explained that a contrary finding would effectively

eliminate any harmless error analysis from reviews of denials of severance, contrary to the numerous decisions invoking such analysis in severance cases. The court concluded that any error in the admission of the codefendant's statements was harmless because the evidence submitted against the defendant established his guilt beyond a reasonable doubt.

The testimony of Jetun Rush and Sean Baylis, coupled with Moore's own confession, was more than sufficient to prove defendant guilty. In addition, the jury was given limiting instructions, admonishing it not to consider either defendant's statement against his codefendant. Prior to opening arguments the trial judge stated, "As I said to you before, also there are two defendants. So each one must be given separate consideration to their cases." Moreover, among the instructions tendered to the jury were the following: Illinois Pattern Jury Instructions, Criminal, Nos. 3.05 and 3.08 (2d ed. 1981).

> "You should give separate consideration to each defendant. Each is entitled to have his case decided on the evidence and the law which is applicable to him.
>
> Any evidence which was limited to one defendant should not be considered by you as to the other defendant."

And:

> "A statement made by one defendant may not be considered by you against any other defendant."

Accordingly, we find that any error from the admission of Dixon's unredacted statement at the parties' joint trial was harmless beyond a reasonable doubt.

## III

Moore's final point is that the trial judge improperly sentenced him to a 40-year term of imprisonment. Moore contends that his sentence is excessive in light of the fact that he had no prior criminal history. He points out that his father died two years earlier of lung cancer and that he was only 16 years old at the time of the crime. Moore held summer jobs and earned a certificate of merit for tutoring children in reading and math. He argues that his character and background suggest the minimum term of imprisonment would be sufficient to protect society and to punish and rehabilitate him.

The court feels that the sentence imposed in this case is a severe one. The court also feels that some public benefit would be realized from a cost ratio study on the issue of whether long sentences in homicide cases reduce crime among teenagers. However, based on the

rules of law which this court must follow, we cannot reduce the sentence in this case.

It is firmly established that the trial court's judgment with regard to the appropriate punishment is entitled to great deference. (*People v. Illgen* (1991), 145 Ill. 2d 353, 379, 583 N.E.2d 515.) A reviewing court cannot alter a sentence absent an abuse of discretion on the part of the trial judge. (*People v. Steppan* (1985), 105 Ill. 2d 310, 323, 473 N.E.2d 1300; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.) A reviewing court must not substitute its judgment for that of a sentencing court merely because it would have weighed the factors differently. *People v. Pittman* (1982), 93 Ill. 2d 169, 178, 442 N.E.2d 836.

The fact that defendant was a first-time offender is no more than a mitigating factor which is to be considered by the court along with other mitigating and aggravating factors. (*People v. Tatum* (1989), 181 Ill. App. 3d 821, 537 N.E.2d 875.) A defendant's lack of a prior record is not necessarily the most persuasive consideration at sentencing (compare *People v. Streit* (1991), 142 Ill. 2d 13, 566 N.E.2d 1351) and, in fact, the seriousness of the crime has been called the most important factor to be considered in imposing sentence. *People v. Hernandez* (1990), 204 Ill. App. 3d 732, 740, 562 N.E.2d 219.

In *People v. Barney* (1982), 111 Ill. App. 3d 669, 679, 444 N.E.2d 518, 525, this court stated as follows:

"[T]he imposition of a sentence of any length within the range provided for the class of the crime of which defendant was convicted is a decision committed by the statute to the discretion of the sentencing court. The statute imposes no requirement that the minimum sentence be imposed in the absence of aggravating factors."

A sentence within the statutory guideline that is alleged to be excessive will not be disturbed on review unless it is manifestly disproportionate to the nature of the offense. *People v. Cabrera* (1987), 116 Ill. 2d 474, 493-94, 508 N.E.2d 708, 716.

The trial judge heard defense counsel's extensive presentation of the factors in mitigation. During sentencing the trial judge acknowledged that this was a tragic case and stated:

"There is no question in my mind these two knew exactly what they had. They had a gun. That was the equalizer for them when they were in the community. And what did they do? They went out in the middle of the afternoon, not ten at night, and because the individual happened to be a big boy and maybe a hero in the particular neighborhood, they decided they'd pick

on him, and of course the equalizer was the gun, on a city street right near a high school. And here they engage this big individual who is the local hero and end up shooting and killing him and taking off.

I have no sympathy for either one of them and I don't think it's just an average type of crime. I think crime on any city street is bad and disagree with you [defense counsel] as far as the sentence is concerned. How can you possibly give the minimum? This is an attempt armed robbery and a murder on the city street in the middle of the afternoon. Streets are bad."

The judge also indicated that no matter what sentence he imposed, Moore and Dixon would still be young men when they are released from prison.

■ Murder is a Class X felony. At the time of sentencing the conviction of murder carried a sentence of 20 to 40 years. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)(a).) The record reflects that the trial judge considered factors in aggravation and mitigation and the sentence imposed was within the statutory guidelines for murder. We cannot hold that the trial judge abused his discretion or failed to follow legislative guidelines in imposing the sentence.

Accordingly, for all the reasons set forth above, we affirm the decision of the trial court.

Judgment affirmed.

McNULTY, P.J., and LORENZ, J., concur.